# EXHIBIT A

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**HIGHLAND-CLARKSBURG HOSPITAL, INC.,**

**Plaintiff,**

**v.**                                        Civil Action No. 21-C-49-1

**RSUI INDEMNITY COMPANY,**
**a foreign corporation,**

**Defendant.**

## COMPLAINT

Plaintiff Highland-Clarksburg Hospital, Inc. ("HCHI") states the following for its Complaint against Defendant RSUI Indemnity Company (RIC"):

### Preliminary Statement

1.     HCHI brings this Complaint to seek a declaration from the Court that RIC owes a duty to indemnify and a duty to defend HCHI.  In addition, because RIC wrongfully refuses to indemnify and defend HCHI, this Complaint seeks damages incurred by HCHI caused by that refusal, including attorneys' fees and expenses.

### The Parties

2.     HCHI is a West Virginia corporation with a principal place of business in Clarksburg, West Virginia.  HCHI is authorized to conduct business in West Virginia and actually conducts business in Harrison County, West Virginia.

3.     RIC is a New Hampshire corporation with a principal place of business at 945 East Paces Ferry Road, Atlanta, Georgia 303026-1160.  RIC is authorized to conduct business in West Virginia and actually conducts business, including entering into insurance contracts, in Harrison County, West Virginia.

## Jurisdiction

4.     This action is brought pursuant to the Uniform Declaratory Judgments Act, W. Va. Code § 55-13-1, *et seq.*, and Rule 57 of the West Virginia Rules of Civil Procedure, pursuant to which this Court has the power to declare the rights and legal relations of HCHI and RIC with respect to the rights and duties that RIC owes under certain insurance contracts and coverages as detailed below.

5.     This Court also has personal jurisdiction over RIC as it transacts business in West Virginia and contracts to insure persons, property and/or risks located within West Virginia.

## Venue

6.     Venue is proper in the Circuit Court of Harrison County, West Virginia, because both HCHL and RIC conduct business in Harrison County, West Virginia, and they entered into an insurance contract in Harrison County, West Virginia, that insures HCHL's operations in Harrison County, West Virginia.

## Factual Background

**Allegations in the Whiteman Complaint.**

7.     This action centers on a dispute whereby HCHI requested that RIC provide both indemnification and a defense for claims asserted by Karen M. Whiteman against HCHI in a civil action pending in the Circuit Court of Harrison County, West Virginia, styled <u>Karen M. Whiteman, Plaintiff, v. Highland-Clarksburg Hospital, Inc., Defendant</u>, Civil Action No. 20-C-265-1 (the "Whiteman Complaint").

8.     In the Whiteman Complaint, plaintiff Karen M. Whiteman alleges age discrimination, hostile work environment, retaliation, and wrongful termination claims against HCHI, as well as a claim for a tort of outrage. <u>See</u> Exhibit 1 (Whiteman Complaint).

2

9.     Specifically, Ms. Whiteman alleges that she began work at HCHI as a Nursing Supervisor on or about October 10, 2016, after which she was promoted to Clinical Educator in April 2017.  Whiteman Complaint at §§3-4.

10.     Ms. Whiteman alleges that, beginning in early 2019, Valerie Huston became her supervisor, after which she alleges that Ms. Huston subjected her to verbal abuse.  Whiteman Complaint at §§4-5.  Ms. Whiteman alleges that she contacted and made complaints to HCHI's Human Resources Department concerning her supervisor, which were ignored or not acted upon. Whiteman Complaint at §§6-8.

11.     Ms. White further alleges that HCHI put her on a Performance Improvement Plan on or about October 31, 2019.  Whiteman Complaint at §9.

12.     Notably, Ms. Whiteman alleges that, after HCHI put Ms. Whiteman on a Performance Improvement Plan, she filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") on November 1, 2019.  Whiteman Complaint at §10.  HCHI has no knowledge of any complaint made by Ms. Whiteman to the EEOC on November 1, 2019, as alleged in the Whiteman Complaint.

13.     Ms. Whiteman alleges that she met with Ms. Hutson, her supervisor, and Robert Boyles, head of HCHI's Human Resources Department on January 31, 2020, when her Performance Improvement Plan ended, which was followed by provision of a memorandum on February 14, 2020, concerning the end of her Performance Improvement Plan.   Whiteman Complaint at §§11-12.

14.     Finally, Ms. Whiteman alleges that she received "an additional corrective action report" on June 12, 2020, that "result[ed] in a constructive discharge."  Whiteman Complaint at §13.

15.     As a result of the factual allegations contained in the Whiteman Complaint, Ms. Whiteman alleged the following causes of action:

    a.    Count I (Age Discrimination);

    b.    Count III (Retaliation in Violation of the West Virginia Human Rights Act);

    c.    Count IV (Retaliation for Reporting Age Discrimination and Hostile Work Environment with the Equal Employment Opportunity Commission);

    d.    Count V (Wrongful Termination - Age Discrimination West Virginia Human Rights Act);

    e.    Count VI (Tort of Outrage).

**EEOC Charge, Notice of Charge and Notice of Dismissal.**

16.     On or shortly after January 21, 2020, HCHI received both a Notice of Charge of Discrimination ("Notice") and a Dismissal and Notice of Rights ("Dismissal") for a Charge of Discrimination filed by Ms. Whiteman on January 17, 2020 ("Charge"). See Exhibit 2 (Charge of Discrimination); Exhibit 3 (Notice of Charge of Discrimination); and Exhibit 4 (Notice of Dismissal and Notice of Rights).

17.     Before it received the Dismissal on January 21, 2020, HCHI did not have any notice that Ms. Whiteman had filed the Charge. In other words, HCHI received the Charge, the Notice, and the Dismissal at the same time.

18.     Because HCHI's first notice of the Charge was that it had been dismissed by the EEOC only 4 days after the Charge was filed, HCHI did not provide notice of the Charge to RIC.

**Notice of the Whiteman Complaint and Notice to RIC.**

19.     Ms. Whiteman filed her complaint in the Circuit Court of Harrison County, West Virginia on November 9, 2020.

20.     HCHI received service of the Whiteman Complaint on or about November 21,

2020.

21.     HCHI submitted the Whiteman Complaint to RIC on November 23, 2020 and requested coverage for the claims asserted in the Whiteman Complaint.

**HCHI's Insurance Policies with RIC.**

22.     Specifically, HCHI sought coverage under a Non-Profit Organization Management Liability Policy issued by RIC for the period August 9, 2019, to August 9, 2020, Policy No. NHP682977 (the "First Policy").   See Exhibit 5 (First Policy).   HCHI renewed the Non-Profit Organization Management Liability Policy, which is in effect for the period August 9, 2020, to August 9, 2021, Policy No. NPP688510 (the "Second Policy").   See Exhibit 6 (Second Policy). The First Policy and the Second Policy are, upon information and belief, identical except for the Policy Period.

23.     Both the First Policy and the Second Policy represent "claims made" policies.

**HCHI's Requests for Coverage from RIC.**

24.     After submitting the Whiteman Complaint to RIC on November 23, 2020, RIC denied coverage by letter dated December 7, 2020, from Kyle W. Dunton, Esq, a Chief Claims Specialist with RSUI Group, Inc. ("Dunton Letter")  See Exhibit 7 (Letter, Kyle W. Dunton, Esq., to Robert Broyles, December 7, 2020).

25.     In the Dunton Letter, RIC took the position that "[i]n order to trigger coverage under this policy, notice must [be] given as soon practicable, but in no event later than 60 days after the expiration of the policy."  Exhibit 7 at p. 5.  RIC took the position that, because RIC received notice of the Charge on January 21, 2020, but did not provide notice of the Charge until November 23, 2020, the First Policy was "not triggered and thus, there is no coverage for" the Wiseman Complaint.

26.     The Dunton Letter also denied coverage under the Second Policy because all of the allegations and claims in the Whiteman Complaint were "deemed to have been first made at least by January 21, 2020[,]" and as "January 21, 2020 is prior to the inception date of the [Second Policy,] . . . the [Second Policy] has not been triggered, and thus, there is no coverage available" to HCHI for the claims in the Whiteman Complaint.

27.     RIC reiterated its denial by email on January 8, 2021 (see Exhibit 8) and by letter dated February 2, 2021 (see Exhibit 9); therefore, HCHI is now forced to file this civil action to obtain the insurance coverage that it is legally owed.

## COUNT I - REQUEST FOR DECLARATORY JUDGMENT

28.     Paragraphs 1 through 27 of this Complaint are incorporated here by reference and are realleged as if fully set forth herein.

29.     A justiciable controversy exists between HCHI and RIC action with respect to the scope, meaning, and application of the policies of insurance issued by RIC and whether RIC owes a duty of defense and a duty of indemnification to HCHI.

30.     The legal rights and obligations of the parties hereto are dependent upon this Court's declaration of the scope, meaning and application of the First Policy and the Second Policy issued by RIC, and to the extent that issues of fact impact such scope, meaning and application of either of those insurance policies to the facts presented in this civil action, a jury in the Northern District of West Virginia must make such findings of fact.

31.     HCHI asks that the Court declare that, under the terms of the policies, RIC is legally obligated to provide a defense to HCHI in reference to the claims made against HCHI in the Whiteman Complaint.

32.     HCHI also asks the Court to declare that, under the terms of the policies, RIC is legally obligated to indemnify HCHI in reference to the claims made against HCHI in the Whiteman Complaint.

33.     HCHI further asks the Court to declare that, pursuant to the legal obligation of RIC to defend and indemnify HCHI, RIC is liable to pay HCHI all costs and expenses, including attorneys' fees and expenses, incurred by HCHI to defend itself against the assertions in the Whiteman Complaint and in seeking to enforce its right to have RIC defend and indemnify it.

## COUNT II - BREACH OF CONTRACT

34.     Paragraphs 1 through 33 of this Complaint are incorporated here by reference and are realleged as if fully set forth herein.

35.     The insurance policies issued by RIC represent written contracts, and as a first-party insured under each policy, HCHI is entitled to receive the benefits provided by those contracts, including the obligation of RIC to defend and indemnify it in defense of the Whiteman Complaint.

36.     RIC has negligently, willfully, wantonly, recklessly, and maliciously breached these contractual duties by failing to defend or indemnify HCHI in relation to the Whiteman Complaint.

37.     As a result of RIC's breaches, HCHI has suffered and will continue to suffer damages, including monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses.

## COUNT III: *HAYSEEDS* CLAIM

38.     Paragraphs 1 through 37 of this Complaint are incorporated here by reference and are realleged as if fully set forth herein.

39.     RIC breached the insurance policies as detailed in this Complaint by failing to defend and indemnify HCHI for the claims made in the Whiteman Complaint.

40.     HCHI has had, and continues to have, a dispute with RIC concerning coverage under the insurance policies and the benefits available to HCHI under the terms of those policies.

41.     HCHI anticipates that it will substantially prevail with regard to the disputes with RIC concerning coverages and benefits under the insurance policies, including that RIC owes a duty to defend against and a duty to indemnify for the claims in the Whiteman Complaint.

42.     HCHI has had to engage counsel to defend itself against the claims asserted in the Whiteman Complaint and to secure the coverage and benefits owed by RIC, including litigation to secure that coverage and those benefits.

43.     For all disputes in which HCHI substantially prevails, including those claims against RIC concerning its failure to meet its obligations under the insurance policies, HCHI is entitled to recover out-of-pocket expenses, attorneys' fees and expenses incurred, and damages for annoyance and inconvenience as permitted by Hayseeds, Inc. v. State Farm Fire & Cas., 177 W. Va. 323, 352 S.E.2d 73 (1986), and its progeny.

44.     The actions and omissions of RIC as described in this Complaint were willful, wanton, and reckless, undertaken with actual malice, in bad faith, and in total disregard of its duties to HCHI, its insured.  RIC knew that HCHI's claim for coverage was proper, but it willfully, maliciously, and intentionally failed to provide that coverage.  The acts of RIC was particularly egregious and conducted with actual malice and in bad faith so as to render RIC liable for punitive damages.

WHEREFORE, HCHI prays that the Court:

A.    Grant declaratory relief pursuant to Declaratory Judgment Act, 28 U.S.C. §2201, and declare that RIC owes HCHI a duty to defend and a duty of indemnification for all claims asserted against HCHI in the Whiteman Complaint;

B.    Award damages in an amount to be determined, including, but not limited to monetary losses, annoyance, inconvenience, aggravation, and attorneys' fees and expenses; and

B.    Award HCHI such other and further relief as this Court deems just and proper.

**HIGHLAND-CLARKSBURG HOSPITAL, INC.**

**By Counsel**

_____

Mychal S. Schulz, Esquire (WVSB No. 6092)
Babst, Calland, Clements & Zomnir, P.C.
300 Summers Street, Suite 1000
Charleston, WV  25301
(681) 205-8888
(681) 205-8814 (fax)
mschulz@babstcalland.com

## **VERIFICATION**

The undersigned, being a representative of Highland-Clarksburg Hospital, Inc., after being duly sworn, hereby deposes and says that she has read the allegations of the foregoing Complaint, and the factual allegations therein are true and correct to the best of her information, knowledge and belief.

_Victoria L. Jones_
Victoria L. Jones,
CEO Highland-Clarksburg Hospital, Inc.

Subscribed and sworn to me this 16 day of February, 2021.

_Stephanie April Ratliff_
Notary Public

My commission expires: August 07, 2024.



OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Stephanie April Ratliff
1109 N. 25th Street
Clarksburg, WV 26301
My Commission Expires August 07, 2024

# **EXHIBIT 1**

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



USPS CERTIFIED MAIL™



9214 8901 1251 3410 0002 9556 46

**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

HIGHLAND-CLARKSBURG HOSPITAL, INC.
WHITNEY PATTERSON
3 HOSPITAL PLAZA
CLARKSBURG, WV 26301

| | | |
|---|---|---|
| **Control Number:** 266451 | **Agent:** WHITNEY PATTERSON |
| **Defendant:** HIGHLAND-CLARKSBURG HOSPITAL, INC. 3 HOSPITAL PLAZA CLARKSBURG, WV 26301 US | **County:** Harrison |
| | **Civil Action:** 20-C-265 |
| | **Certified Number:** 92148901125134100002955646 |
| | **Service Date:** 11/13/2020 |

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your corporation as your attorney-in-fact.  Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office.***

Sincerely,

*Mac Warner*

Mac Warner
Secretary of State

# S U M M O N S
## CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

KAREN M. WHITEMAN

### Plaintiff

v.                            20-C-265          CHRISTOPHER JOHN MCCARTHY

HIGHLAND-CLARKSBURG HOSPITAL, INC.
3 HOSPITAL PLAZA
CLARKSBURG        WV   26301

### Defendant

To the Above-Named Defendant(s):
IN THE NAME OF THE STATE OF WEST VIRGINIA,

you are hereby summoned and required to serve upon
KLIE LAW OFFICE
Plaintiff's attorney whose address is
85 WEST MAIN STREET
BUCKHANNON, WV  26201

an answer, including any related counter-claim you may have, to the
complaint filed against you in the above-styled civil action, a true
copy of which is herewith delivered to you. You are required to serve
your answer within 30 days after service of this summons upon you,
exclusive of the day of service.

If you fail to do so, judgement by default will be taken
against you for the relief demanded in the complaint and you will be
thereafter barred from asserting in another action any claim you may
have which must be asserted by counter claim in the above-styled
civil action.

DATED: 11/09/20

ALBERT F.MARANO, CLERK
Harrison County Circuit Court

By: _Albert F. Marano_ , Deputy
am

## IN THE CIRCUIT COURT OF _____HARRISON_____ COUNTY, WEST VIRGINIA

## CIVIL CASE INFORMATION STATEMENT
### (Civil Cases Other than Domestic Relations)

### I. CASE STYLE:

**Plaintiff(s)**

Karen M. Whiteman

c/o Klie Law Offices, PLLC

85 W. Main Street, Buckhannon, WV 26201

**vs.**

**Defendant(s)**

Highland-Clarksburg Hospital, Inc.
Name

c/o Whitney Patterson, 3 Hospital Plaza
Street Address

Clarksburg, WV 26301
City, State, Zip Code

Case No. 20-C-2165-1

Judge: McCarthy

| Days to Answer | Type of Service |
|---|---|
| 30 | Secretary of State |

FILED CIRCUIT COURT 2020 NOV -6 PM 3:18 CIRCUIT COURT

### II. TYPE OF CASE:

- [✓] General Civil
- [ ] Mass Litigation *[As defined in T.C.R. 26.04(a)]*
  - [ ] Asbestos
  - [ ] FELA Asbestos
  - [ ] Other: _____
- [ ] Habeas Corpus/Other Extraordinary Writ
- [ ] Other: _____

- [ ] Adoption
- [ ] Administrative Agency Appeal
- [ ] Civil Appeal from Magistrate Court
- [ ] Miscellaneous Civil Petition
- [ ] Mental Hygiene
- [ ] Guardianship
- [ ] Medical Malpractice

### III. JURY DEMAND: [✓] Yes [ ] No  CASE WILL BE READY FOR TRIAL BY (Month/Year): 01 / 2022

### IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS?
[ ] Yes [✓] No

**IF YES, PLEASE SPECIFY:**
- [ ] Wheelchair accessible hearing room and other facilites
- [ ] Reader or other auxiliary aid for the visually impaired
- [ ] Interpreter or other auxiliary aid for the deaf and hard of hearing
- [ ] Spokesperson or other auxiliary aid for the speech impaired
- [ ] Foreign language interpreter-specify language: _____
- [ ] Other: _____

Attorney Name: Melissa T. Roman, Esq.

Firm: Klie Law Offices, PLLC

Address: 85 W. Main Street, Buckhannon, WV 26201

Telephone: (304) 472-5007

[ ] Proceeding Without an Attorney

Representing:
- [✓] Plaintiff
- [ ] Defendant
- [ ] Cross-Defendant
- [ ] Cross-Complainant
- [ ] 3rd-Party Plaintiff
- [ ] 3rd-Party Defendant

Original and ____4____ copies of complaint enclosed/attached.

Dated: 11 / 5 / 20     Signature: _____

**SCA-C-100: Civil Case Information Statement (Other than Domestic Relations)**     Revision Date: 12/2015

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

KAREN M. WHITEMAN,

        Plaintiff,

v.                                      Civil Action No.: 20-C-245-1

HIGHLAND-CLARKSBURG HOSPITAL, INC.,

        Defendant.

## COMPLAINT

NOW COMES the Plaintiff, Karen M. Whiteman, and for her cause of action against Defendant, states and alleges as follows, to-wit:

1. Plaintiff, Karen M. Whiteman (hereinafter referred to as "Plaintiff" or "Plaintiff Whiteman") is an adult individual and resident of Gypsy, Harrison County, West Virginia.

2. Based upon information and belief, Defendant, Highland-Clarksburg Hospital, Inc., (hereinafter referred to as "Defendant Highland"), is a for profit domestic corporation, with a notice of process address of Whitney Patterson, 3 Hospital Plaza, Clarksburg, WV 26301 and its principal place of business located at 3 Hospital Plaza, Clarksburg, WV 26301.

3. Plaintiff began her original employment with Defendant Highland on or about October 10, 2016 as a Nursing Supervisor. On or about April 2017, Plaintiff was promoted to the salary position of Clinical Educator.

4. In early 2019, after some changes in management, Plaintiff had a supervisor to report to, namely, Valerie Hutson.

5. For several months thereafter, Plaintiff was subject to being treated in a disparate

1

manner due to her age, including being verbally abused by said Valerie Hutson as well as had to endure hearing the co-workers on her team being verbally abused repeatedly by the said Valerie Hutson.

6. Said disparate treatment created toward Plaintiff by the Defendant caused a work environment that became so intolerable that Plaintiff Whiteman filed complaints with Defendant's Human Resources Department.

7. Plaintiff Whiteman was refused or otherwise ignored for her complaints to Defendant's Human Resources Department.

8. On or about June 6, 2019, Plaintiff filed an official complaint of discrimination and hostile work environment with the confidential compliance line offered through Defendant Highland.

9. On or about October 31, 2019, Plaintiff was given a Performance Improvement Period by Defendant Highland.

10. On or about November 1, 2019, Plaintiff filed a complaint with United States Equal Employment Opportunity Commission ("EEOC").

11. On or about January 31, 2020, Plaintiff's Performance Improvement Plan's 90 days ended and a meeting was held with Plaintiff, Valerie Hutson, and Robert Boyles.

12. On or about February 14, 2020, a memorandum was provided to Plaintiff regarding the end of the Performance Improvement Plan reiterating Plaintiff's improvement and positive changes.

13. On or about June 12, 2020, Plaintiff received an additional corrective action report resulting in a constructive discharge.

14. At all times relevant herein, Plaintiff performed all of her job duties in a satisfactory

2

and/or above satisfactory manner and any contention to the contrary is merely a pretext.

## COUNT I – AGE DISCRIMINATION

15. Plaintiff Whiteman hereby restates each and every allegation contained in paragraphs one (1) through fourteen (14) of this Complaint as if fully rewritten herein.

16. Plaintiff Whiteman was at all times relevant herein a member of a protected class of individuals as she was over the age of forty.   Based upon information and belief Plaintiff Whiteman maintains and therefore avers that she was treated in a disparate manner based upon in whole or in part by her age classification.

17. The aforesaid age discrimination was inflicted upon Plaintiff Whiteman in direct violation of the West Virginia Human Rights Act, W.Va. Code § 5-11-1, *et seq.*

18. As a direct and proximate result of the outrageous and wrongful actions aforesaid, Plaintiff Whiteman has suffered injuries, damages and losses as hereinafter set forth.

## COUNT II:   HOSTILE WORK ENVIRONMENT

19. Plaintiff Whiteman hereby re-alleges each and every allegation contained in paragraphs one (1) through eighteen (18) as if fully restated herein.

20. During the duration of Plaintiff Whiteman's employment with Defendant Highland and/or other representatives, employees and/or agents of Defendant, Highland, made offensive comments, statements and/or suggestions about or directed to Plaintiff Whiteman, including but not limited to remarks about her age. Further,

3

Defendant's sudden insistence to regularly evaluate, berate and yell at Plaintiff made her work feel intolerable.

21. Such behavior was unwelcome by Plaintiff Whiteman in the work environment and rendered the workplace and working conditions hostile and unbearable.

22. As a direct and proximate result of the illegal, wrongful, reckless, willful, intentional, negligent, and tortuous harassment of Plaintiff Whiteman by Defendant, Plaintiff has suffered damages as hereinafter set forth.   Further, based on the behavior of Defendant, Plaintiff claims punitive damages.

## COUNT III- RETAILATION IN VIOLATION OF THE WEST VIRGINIA HUMAN RIGHTS ACT

23. Plaintiff hereby realleges each and every allegation contained in paragraphs one (1) through twenty-two (22) of this Complaint as if fully rewritten herein.

24. Plaintiff alleges that Defendant and/or other representatives, employees and/or agents of Defendant Highland engaged in various retaliatory actions against her as a result of her age and reporting discrimination and hostile work environment in violation of the West Virginia Human Rights Act, West Virginia Code § 5-11-1 *et seq.*

25. After Plaintiff engaged in said protected activity, Defendant took adverse action against the Plaintiff by demoting, harassing, suspending, threatening and ultimately constructively discharging Plaintiff from employment. That the purpose of Defendant in so acting was to prevent Plaintiff, through economic and psychological intimidation, from seeking relief, in violation of the West Virginia Human Rights Act, West Virginia Code § 5-11-1 *et seq.*

4

26. Pursuant to its conduct, Defendant acted to deprive the Plaintiff of her rights under the West Virginia Human Rights Act, West Virginia Code § 5-11-1 *et seq.* by wrongfully terminating her employment in retaliation for filing complaints of discrimination and hostile work environment.

27. Plaintiff Whiteman's discharge was followed by her report to Defendant Highland regarding age discrimination and hostile work environment. It is unlawful in the State of West Virginia and against public policy to discriminate against an employee based on their age.

28. Even at will employees may recover for wrongful termination "where the firing was motivated by an intention to contravene some substantial public policy." *Harless v. First Nat'l Bank,* 192 W.Va. 116, 246 S.E.2d 270 (1978).

29. West Virginia recognizes a substantial public policy that an employee cannot be retaliated against for filing good faith based complaints of discrimination and hostile work environment. Such substantial public policy of retaliation is illegal and specifically outlined under the West Virginia Human Rights Act, West Virginia Code § 5-11-1 *et seq.*

30. Defendant's actions, therefore, were in violation of West Virginia public policy, as evidenced by, but not limited to, the Defendant's demotion of Plaintiff, harassment and disparaging remarks made to her on the basis of her protected class and status, threats, and discharge from employment after Plaintiff reported claims of discrimination and hostile work environment.

31. Based upon information and belief, Plaintiff's termination was based at least in part on her reporting said behavior. Plaintiff Whiteman did not commit any separate dischargeable offense.

32. As a direct and proximate result of the illegal, wrongful, willful, intentional harassment and retaliation of Plaintiff by Defendant and its agents, Plaintiff has suffered damages and losses as hereinafter set forth.

## COUNT IV – RETALIATION FOR REPORTING AGE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

33. Plaintiff hereby realleges each and every allegation contained in paragraphs one (1) through thirty two (32) of this Complaint as if fully rewritten herein.

34. Plaintiff alleges that Defendants and/or other representatives, employees and/or agents of Defendant Highland engaged in various retaliatory actions against her as a result of her age and reporting discrimination and hostile work environment to the EEOC.

35. Plaintiff's actions of filing an EEOC complaint against Defendant constituted a protected activity under the EEOC laws, under Title VII of the Civil Rights Act of 1964, Sections 704, 705, and 706, *et seq*.

36. After Plaintiff engaged in said protected activity, Defendant took adverse action against the Plaintiff by demoting, harassing, suspending, threatening and ultimately constructively discharging Plaintiff from employment. That the purpose of Defendant in so acting was to prevent Plaintiff, through economic and

6

psychological intimidation, from seeking the relief provided by EEOC laws, under Title VII of the Civil Rights Act of 1964, Sections 704, 705, and 706, et seq.

37. Pursuant to its conduct, Defendant acted to deprive the Plaintiff of her civil rights, by repeated and insidious acts of harassment, intimidation, and discharge from employment, all in violation of EEOC laws, under Title VII of the Civil Rights Act of 1964, Sections 704, 705, and 706, *et seq.*

38. As a direct and proximate result of the illegal, wrongful, willful, intentional, harassment and retaliation of Plaintiff by Defendant and its agents, Plaintiff has suffered damages and losses as hereinafter set forth.

### COUNT V - WRONGFUL TERMINATION- AGE DISCRIMINATION WEST VIRGINIA HUMAN RIGHTS ACT

39. Plaintiff Whiteman hereby re-alleges each and every allegation contained in paragraphs one (1) through thirty-eight (38) as if fully restated herein.

40. Plaintiff was a member of a protected class of individuals based upon her age.

41. Plaintiff's termination from her employment was based upon, in whole or in part, Plaintiff's age, in violation of the *West Virginia Human Rights Act*, W.Va. Code § 5-11-9(1).

42. As a direct and proximate result of the outrageous and wrongful actions aforesaid, Plaintiff has suffered injuries, damages and losses as hereinafter set forth.

### COUNT VI - TORT OF OUTRAGE

43. Plaintiff Whiteman hereby re-alleges each and every allegation contained in paragraphs one (1) through forty-two (42) as if fully restated herein.

7

44. The age discrimination, hostile work environment, retaliation for reporting hostile work environment and discrimination, and wrongful termination acts and/or omissions taken against Plaintiff Whiteman by Defendant Highland were done in a severe and outrageous manner and were so extreme as to be intolerable in a civilized society.

45. Defendant acted intentionally and recklessly which caused Plaintiff extreme emotional distress.

46. Defendant knew that said intentional and reckless actions would cause Plaintiff to suffer extreme emotional distress.

47. As a direct and proximate result of the outrageous and wrongful actions aforesaid, Plaintiff has suffered injuries, damages and losses as hereinafter set forth.

## DAMAGES

48. Plaintiff hereby restates each and every allegation contained in paragraphs one (1) through forty-seven (47) of this Complaint as if fully rewritten herein.

49. As a direct and proximate result of the acts and/or omissions of Defendant as hereinbefore alleged, Plaintiff has been caused to suffer injuries, damages and losses, including but not limited to: back pay, lost benefits, front pay, future loss of benefits, emotional distress, anxiety, fear, embarrassment, humiliation, financial hardship, and attorney fees.

50. All of the acts of Defendant and its agents, servants, and employees, as alleged in each count of this Complaint were willful, wanton, and malicious and/or reckless

and/or in reckless disregard for the civil rights of Plaintiff Whiteman such that punitive damages are warranted.

WHEREFORE, Plaintiff, Karen M. Whiteman, demands judgment against the Defendant, Highland-Clarksburg Hospital, Inc. in an amount that would adequately compensate Plaintiff for the unlawful acts and/or omissions and violations of law by Defendant, plus whatever other relief the Court or Jury would deem just; and for punitive damages in an amount adequate to punish and deter Defendant from committing this type of conduct in the State of West Virginia in the future and in such amounts as will satisfy all other reasons of law and public policy for an award of punitive damages; and Plaintiff further prays for an award of attorney fees, costs, interest, and for such other relief as the Court or jury deems just.

### PLAINTIFF DEMANDS A TRIAL BY JURY.

Karen M. Whiteman,
By Counsel,

Erika Klie Kolenich, Esq. (9880)
Melissa T. Roman, Esq. (10576)
Klie Law Offices, PLLC
85 W. Main St.
Buckhannon, WV 26201
(304) 472-5007
Facsimile: 304-472-1126
ehklie@klielawoffices.com
mroman@klielawoffices.com

9

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

KAREN M. WHITEMAN,

        Plaintiff,

v.                              Civil Action No.: 20-C-265-1

HIGHLAND-CLARKSBURG HOSPITAL, INC.,

        Defendant.

**VERIFICATION**

STATE OF WEST VIRGINIA;
COUNTY OF Marion ; TO-WIT:

I, **Karen M. Whiteman**, named in the foregoing *COMPLAINT,* after being first duly sworn, do hereby swear that the facts and allegations therein contained are true, except insofar as they are therein stated to be upon information and belief, I believe them to be true.

                             Karen M. Whiteman

Taken, subscribed, and sworn to before me, a Notary Public, by **Karen M. Whiteman** on this the 30th day of October , 2020.

Notary Public

My Commission expires on: May 16, 2021

Official Seal
Notary Public, State Of West Virginia
Tracy L. Young
27 Pine Ridge Lane
Fairmont, WV 26554
My Commission Expires May 16, 2021

10

# EXHIBIT 2

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 533-2020-00207 |

| PENNSYLVANIA HUMAN RELATIONS COMMISSION | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(Indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| MS. KAREN M WHITEMAN | (304) 627-4878 | 1966 |

| Street Address | City, State and ZIP Code |
|---|---|
| 64 FLEMING ST, PO BOX 224,  GYPSY, WV 26361 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.  *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| HIGHLAND CLARKSBURG HOSPITAL | 15 - 100 | (304) 969-3100 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3 HOSPITAL DRIVE,  CLARKSBURG,  WV 26301 | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | Earliest 10-31-2019    Latest 10-31-2019 |
| ☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I am currently employed as a Clinical Educator by the above named Respondent.  From April 1, 2019 and continuing, I and others have been subjected to harassment, such as but not limited to, verbal abuse, weekly meetings, job criticism, and micromanagement by Valerie Hudson, Manager (mid 30's).  On June 6, 2019, I filed a hostile work environment complaint to Brandy Robinson, PIQA Risk Manager.  On July 24, 2019, I and others met with Vicky Jones, CEO and complained about Miss Hudson's actions.  Despite my complaint, the harassment continued.  On October 31, 2019, I was placed on a Performance Improvement Plan.

I was told that I have a negative attitude by Miss Hudson.

I believe that I have been retaliated and discriminated against based on my age, 53, in violation of the Age Discrimination in Employment Act of 1967, as amended (ADEA) when I was placed on a Performance Improvement Plan after I filed a hostile work environment complaint.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Karen Whiteman on 01-17-2020 08:18 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint.  Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings.  Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# EXHIBIT 3

**Robert Boyles**

| | |
|---|---|
| **From:** | U.S. Equal Employment Opportunity Commission <noreply@eeoc.gov> |
| **Sent:** | Tuesday, January 21, 2020 12:29 PM |
| **To:** | Robert Boyles |
| **Subject:** | Notice of Charge of Discrimination |
| **Attachments:** | eeoc_color_seal1293918425559585135eeoc_color_seal |
| | |
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |



**U.S. Equal Employment Opportunity Commission**
**Pittsburgh Area Office**
**1000 Liberty Avenue**
**Room 1112**
**Pittsburgh, PA 15222**

**NOTICE OF CHARGE OF DISCRIMINATION**
**(This Notice replaces EEOC FORM 131)**

**DIGITAL CHARGE SYSTEM**

January 21, 2020

To:
Mr. Robert Boyled
Human Resources Director
HIGHLAND CLARKSBURG HOSPITAL
rboyles@highlandhospital.net

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Karen M. Whiteman , under: The Age Discrimination in Employment Act (ADEA). The circumstances of the alleged discrimination are based on Retaliation, and involve issues of Discipline that are alleged to have occurred on or about Oct 31, 2019.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system: https://nxg.eeoc.gov/rsp/login.jsf
2. Enter this EEOC Charge No.: 533-2020-00207
3. Enter this temporary password: im6346ks

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to pittsburghareaoffice@eeoc.gov.

**Preservation of Records Requirement**
EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

**Non-Retaliation Requirements**
The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

**Legal Representation**
Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

Please retain this notice for your records.

*Notice of Confidentiality: The information contained in this transmission may contain privileged and confidential information, including information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact us at digital-support@eeoc.gov and destroy all copies of the original message and attachments.*

# EXHIBIT 4

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Karen M. Whiteman<br>64 Fleming St<br>PO BOX 224<br>Gypsy, WV 26361 | From: | Pittsburgh Area Office<br>1000 Liberty Avenue<br>Room 1112<br>Pittsburgh, PA 15222 |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **533-2020-00207** | **Philadelphia Legal Unit** | **(267) 589-9700 X3** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Jamie R Williamson*

**Jamie R. Williamson,
Director**

January 21, 2020

*(Date Mailed)*

Enclosures(s)

cc:     **Robert Boyled**
        **Human Resources Director**
        **HIGHLAND CLARKSBURG HOSPITAL**
        **3 Hosptal Drive**
        **Clarksburg, WV 26301**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# EXHIBIT 5



**RSUI Indemnity Company**

**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA  30326-1160

# NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS. THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

**Mail notices to:**   RSUI Group, Inc.
945 East Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326-1160

**Fax notices to:**   (404) 231-3755
Attn: Claims Department

**E-mail notices to:**   reportclaims@rsui.com

**RSUI's Panel Counsel Finder:** Panel Counsel Link

*A member of Alleghany Insurance Holdings LLC*

RSG 211008 0118

## NON-PROFIT ORGANIZATION COMMON POLICY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | PP682977 | NHP677990 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME AND MAILING ADDRESS                    PRODUCER'S NAME AND ADDRESS

HIGHLAND-CLARKSBURG HOSPITAL, INC.
#3 HOSPITAL PLAZA
CLARKSBURG, WV 26301

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM _____8/9/2019_____ TO _____8/9/2020_____ 12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

|  | | Purchased | Shared Limit | Separate Limit |
|---|---|---|---|---|
| A. | Directors and Officers Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
| B. | Employment Practices Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
|  | 1)  Third Party Liability Coverage | ☒ Yes ☐ No | | |
| C. | Fiduciary Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |

**ITEM 4. LIMIT OF LIABILITY:**

$ _2,000,000_____   Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$ _____   Total Policy Premium for All Coverage Sections

+ WV Fire Protection Surcharge

> THIS COMPANY IS NOT LICENSED TO DO BUSINESS IN WEST VIRGINIA, AND IS NOT SUBJECT TO THE WEST VIRGINIA INSURANCE GUARANTY ACT. (W.Va. Code St. R. 114-20-4)

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS -- RSG 210077 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____      ___September 05, 2019___      _____
                                                          DATE                     AUTHORIZED REPRESENTATIVE

# NON-PROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP682977 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

## ITEM 2. LIMIT OF LIABILITY:

A.  Directors and Officers Limit of Liability            $  2,000,000
B.  Additional Side-A Limit of Liability                   $  500,000

## ITEM 3. RETENTION:

A. Directors and Officers Liability Retentions
1)  Insuring Agreement A                       $  _____
2)  Insuring Agreement B                       $  _____
3)  Insuring Agreement C                       $  _____

## ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:

Directors and Officers Prior and/or Pending Litigation Date:   10/01/2012

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____        September 05, 2019            _Kim Hadfield_
                                                                   DATE                                   AUTHORIZED REPRESENTATIVE

# NON-PROFIT ORGANIZATION EMPLOYMENT PRACTICES LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP682977 |

## ●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

**ITEM 2. LIMIT OF LIABILITY:**

A.  Employment Practices Limit of Liability             $ 2,000,000
(Including Third Party Liability, if purchased)

B.  Workplace Violence Expenses Sublimit            $ 250,000

**ITEM 3. RETENTION:**

A.  Employment Practices Liability Retentions

1)  Employment Practices Liability                $ _____

2)  Third Party Liability Coverage                $ _____

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Employment Practices Prior and/or Pending Litigation Date:     10/01/2012

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____         September 05, 2019         _____
DATE                                          AUTHORIZED REPRESENTATIVE

# NON-PROFIT ORGANIZATION FIDUCIARY LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP682977 |

### ●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

**ITEM 2. LIMIT OF LIABILITY:**

Fiduciary Limit of Liability                              $  1,000,000

**ITEM 3. RETENTION:**

Fiduciary Liability Retention                         $  _____

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Fiduciary Liability Prior and/or Pending Litigation Date:      08/19/2013

**ITEM 5. FIDUCIARY LIABILITY ADDITIONAL COVERAGES:**

| ADDITIONAL COVERAGES | SUBLIMIT | RETENTION | PRIOR/PENDING LITIGATION DATE |
|---|---|---|---|
| ☒HIPAA Violations | $25,000 | | 08/19/2015 |
| ☒Voluntary Compliance Fees or Sanctions | $100,000 | | 08/19/2015 |
| ☒PPACA Civil Money Penalties | $25,000 | | 08/19/2015 |
| ☐Plan Value Fiduciary Liability | N/A | | N/A |
| ☐Settlor Breaches of Duty | N/A | | N/A |
| ☐Other Penalties | N/A | | N/A |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____       September 05, 2019 ___       _Kym Hodge_____
                                                                          DATE                              AUTHORIZED REPRESENTATIVE

## NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY SUPPLEMENTAL DECLARATIONS



POLICY NUMBER:   NPP682977

### SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| West Virginia Changes-Extended Reporting Period | RSG 202078 0118 |
| West Virginia Changes-Cancellation and Nonrenewal | RSG 203035 0118 |
| Disclosure Pursuance to Terrorism Risk Insurance Act | RSG 204123 0116 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Non-Profit | RSG 211003 0118 |
| Amended Definition of Loss-Defense Claims for ADA | RSG 214076 0118 |
| Class Action Retention | RSG 204181 0118 |
| Coverage Extension-Healthcare Organization | RSG 214078 0118 |
| Coverage Extension-HIPAA | RSG 214077 0118 |
| Exclusion-Amended Bodily Injury and Property Damage | RSG 206118 0119 |
| Exclusion-Prior Acts | RSG 206108 0118 |
| Exclusion-Prior and or Pending Litigation Backdated-Higher Limits | RSG 206070 0118 |
| Exclusion-Sexual Misconduct and Child Abuse | RSG 206076 0118 |
| Exclusion-Specific Entities and Individuals | RSG 206114 0118 |
| Fully Non-Rescindable Coverage | RSG 204157 0119 |
| West Virginia-Full Severability | RSG 202107 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Non-Profit | RSG 211009 0118 |
| Exclusion-Malpractice | RSG 206107 0118 |
| **FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY** | |
| Employment Practices Liability Coverage Section-Non-Profit | RSG 211010 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |
| **FORMS APPLICABLE TO FIDUCIARY LIABILITY** | |
| Fiduciary Liability Coverage Section-Non-Profit | RSG 211011 0118 |

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA CHANGES – EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – COVERAGE EXTENSIONS, B. Extended Reporting Period of the Common Policy Terms and Conditions Coverage Section, the last paragraph is deleted and replaced by the following:

**B.  Extended Reporting Period**

The rights contained in this clause shall apply in the event of cancellation resulting from non-payment of premium but only after the **Insured Organization** has paid the earned premium balance due.

All other terms and conditions of this policy remain unchanged.

---

**Policy No.:  NPP682977**     **Effective:  8/9/2019**

RSG 202078 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The provision in SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section which indicates that proof of mailing will be sufficient notice is deleted.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP682977       **Effective:**  8/9/2019

RSG 203035 0118

**RSUI INDEMNITY COMPANY**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| | |
|---|---|
| Terrorism Premium | $0 |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury -- in consultation with the Secretary of Homeland Security, and the Attorney General of the United States -- to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

Policy No.: NPP682977     **Effective:** 8/9/2019

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977      **Effective:** 8/9/2019

RSG 204198 0118



# *www.RSUIextra.com*

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### <u>Key Features</u>

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
  - Preventing Sexual Harassment
  - Preventing Discrimination
  - Preventing Wrongful Termination
  - Promoting Ethical Behavior

### <u>How to get started</u>

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

### <u>Who is a Site Administrator?</u>

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### <u>Questions?</u>

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

# COMMON POLICY TERMS AND CONDITIONS
## COVERAGE SECTION (NON-PROFIT)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application,** and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections.**  Unless stated to the contrary in any **Coverage Section,** the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy.  If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section,** including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section.**

## SECTION II. - COVERAGE EXTENSIONS

### A.  Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B.  Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period.**  The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C.  Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person.**

## SECTION III. – DEFINITIONS

**A. Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

**B. Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**C. Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

**D. Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

1. Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

2. Any obligation to apply for or furnish any appellate or similar bond.

**E. Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**F. Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

**G. Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**H. Insured Organization** means:

1. The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

2. Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

**I. Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**J. Insurer** means the Company providing this insurance as shown on the Declarations Page.

**K. Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**L. Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

**M. Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

1. Owns more than fifty percent (50%) of the voting interest; or

2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors or trustees.

A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting interest, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, or trustees, either directly or indirectly, or through one or more of its **Subsidiaries**.

**N. Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   a. Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   b. Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

      (1) The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (2) The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (3) The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

      (4) Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing.  No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld.  Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy.  The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate.  If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

**1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**. **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

**2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**. Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

**3.** As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

**4.** All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

**5.** In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

**6.** Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person,** provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

**7.** The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

**8.** Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

**1.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

2.  If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**.  The written notice shall include, at a minimum:

    a.  The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

    b.  The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

### D.  Cooperation

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

### E.  Allocation

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non-covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**.  If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary.  Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

### F.  Cancellation; Renewal Provision

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due.  In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice.  The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page.  The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration.  The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer.**  If notice is mailed, proof of mailing will be sufficient proof of notice.

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition.  After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period:**

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction.  This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H. Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy.  This policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I. No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J.  Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K.  Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L.  Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy.  The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M.  Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N.  Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O.  Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P.  Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q.  Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R.  Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy.  Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                         President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED DEFINITION OF LOSS – DEFENSE CLAIMS FOR ADA

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, E. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

**E.  Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses.  Loss** (other than **Defense Expenses)** shall not include:

1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds;**

2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4.  The cost of creating or reinstating employment;

5.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim;**

6.  Civil criminal fines or penalties;

7.  Taxes, whether owed to or by any **Insured;**

8.  Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar;

9.  Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

B.  SECTION III. – DEFINITIONS, G. of the Employment Practices Liability Coverage Section is deleted and replaced by the following:

**G.  Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses.  Loss** (other than **Defense Expenses)** shall not include:

1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds;**

2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4.  The cost of creating or reinstating employment;

5.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested

without regard to any **Claim**;

6. Civil criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CLASS ACTION RETENTION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Declarations Page:

**ITEM 7. RETENTION:**

$ _____        Each claim for an actual or putative class action

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION – HEALTHCARE ORGANIZATION

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY

A.  SECTION III. - DEFINITIONS **D. Insured Person** in the Directors and Officers Liability Coverage Section and **F. Insured Person** in the Employment Practices Liability Coverage Section is amended to include the following:

**Insured Person** shall include any past, present or future member of any duly constituted committee ("Committee Member"), any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician ("Outside Expert"), any individual in charge of any operational department ("Department Head") or any staff physician or faculty member of the **Insured Organization**, regardless of whether they are considered as an **Employee** of the **Insured Organization** or an independent contractor.

B.  SECTION III. - DEFINITIONS **E. Loss** in the Directors and Officers Liability Coverage Section and **G. Loss** in the Employment Practices Liability Coverage Section is amended to include the following:

1.  **IRS Fines**

    **Loss** shall include **Defense Expenses** incurred in connection with a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

    Section 4911 (tax on excess expenditures to influence legislation);

    Section 4940 (a) (tax on net investment income of tax-exempt foundations);

    Section 4941 (taxes on self-dealing);

    Section 4942 (taxes on failure to distribute income);

    Section 4943 (taxes on excess business holding);

    Section 4944 (taxes on investments which jeopardize charitable purpose);

    Section 4945 (taxes on taxable expenditures);

    Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);

    Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and

    Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2.  **Excess Benefit Penalty Coverage**

    **Loss** shall include the ten percent (10%) "Excess Benefit" penalty which might be assessed by the Internal Revenue Service against any individual **Insured Person** for management involvement in the award of an "Excess Benefit".

    No coverage shall be provided by this policy for any individual **Insured Person** subject to the twenty five percent (25%) "Excess Benefit" penalty assessed by the Internal Revenue Service against any such **Insured Person** as a "disqualified person"; provided, however, that **Defense Expense** incurred in connection with the twenty five percent (25%) "Excess Benefit" penalty shall be provided to such **Insured Person**.

    Under no circumstances shall the **Insurer** be liable for the payment of **Loss** attributable to any two hundred percent (200%) penalty assessed by the Internal Revenue Service for failure to correct the award of an "Excess Benefit."

**Policy No.:** NPP682977      **Effective:** 8/9/2019

For purposes of this endorsement, the terms "Excess Benefit" and "disqualified person" shall be defined in the "Taxpayer Bill of Rights 2", (H.R. 2337, P.L. 104–168).

3. **EMTALA Coverage**

   **Loss** shall include the fines, penalties and **Defense Expenses** resulting from any **Claim** arising out of or in connection with an actual or alleged violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd et seq., and any similar state or local statute.

4. **Government Funding Defense Expense Coverage**

   **Loss** shall not include the return of funds which were received from any federal, state or local governmental agency; provided, however, that with respect to any **Claim** arising out of the return or request to return, such funds, and subject to a Retention amount of          the **Insurer** shall pay **Defense Expenses** up to a total of $1,000,000 incurred by the **Insured** on a fifty percent (50%) coinsurance basis, with fifty percent (50%) of such **Defense Expenses** to be borne by the **Insured** and to remain uninsured; and the remaining fifty percent (50%) of such **Defense Expenses** to be covered by the **Insurer** subject to all other terms, conditions and exclusions of this policy.

   Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION - HIPAA

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY

SECTION III. – DEFINITIONS, **E. Loss** of the Directors and Officers Liability Coverage Section and **G. Loss** of the Employment Practices Liability Coverage Section shall be amended by adding the following:

Notwithstanding anything in this DEFINITION to the contrary, **Loss** shall include any civil money penalties imposed upon an **Insured** for violation of Title II of the Health Insurance Portability and Accountability Act ("HIPAA"), amendments to such law or regulations promulgated under such law concerning privacy of health information; provided the **Insurers** maximum aggregate Limit of Liability for all such civil money penalties on account of all **Claims** first made during the **Policy Period** shall be $25,000.  This sublimit shall be one sublimit only, regardless of the number of Coverage Sections purchased by any or all **Insureds,** and shall be part of and not in addition to the amount set forth in Item 4. of the Common Policy Declarations Page.

A Retention in the amount of                   shall apply to any **Loss** arising from a **Claim** alleging violation of HIPAA.  Such retention shall be borne by the **Insured,** and the **Insurer** shall only be liable for the amount of **Loss** arising from a HIPAA **Claim** which is in excess of the above stated retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977       **Effective:**  8/9/2019

RSG 214077 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – AMENDED BODILY INJURY AND PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

  6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

   a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; or

   b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

B.  The first paragraph of SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced with the following:

  2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

   a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

   b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977      **Effective:** 8/9/2019

RSG 206118 0119

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to <u>October 01, 2012</u>.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977      **Effective:** 8/9/2019

RSG 206108 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR AND/OR PENDING LITIGATION BACKDATED (HIGHER LIMITS)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. - EXCLUSIONS, 4. of the Directors and Officers Liability Coverage Section, 1. of the Employment Practices Liability Coverage Section and 1. of the Fiduciary Liability Coverage Section are deleted and replaced with the following:

Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or pending as of October 01, 2012, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

With respect to the portion of the Limit of Liability that is $1,000,000 excess $1,000,000, the **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** arising out of, based upon or attributable to, in whole or in part, litigation prior to or pending as of August 09, 2017.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977      **Effective:** 8/9/2019

RSG 206070 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SEXUAL MISCONDUCT AND CHILD ABUSE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to or in any way involving, directly or indirectly, any **Sexual Misconduct**, child abuse or neglect, including but not limited to the employment, supervision, reporting to the proper authorities, failure to so report or retention of any person.

**Sexual Misconduct** means any licentious, immoral or sexual behavior, sexual abuse, sexual assault or molestation or any sexual act against any individual.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977     **Effective:** 8/9/2019

RSG 206076 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SPECIFIC ENTITIES AND INDIVIDUALS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** which is brought by or on behalf of the following entities or individuals:

   HHA, Inc.


including, but not limited to any **Claim** brought by any director, officer, heir, trustee or partner of the entity, or by any security holder thereof, whether such **Claim** is brought directly or derivatively.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977      **Effective:** 8/9/2019

RSG 206114 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FULLY NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this policy shall be non-rescindable by the **Insurer**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP682977        **Effective:** 8/9/2019

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA - FULL SEVERABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, H. Representations of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**H.  Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy.  This policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the information, particulars, documents, representations and statements of material fact contained in the **Application** are untrue, this policy shall not afford coverage to any **Insured** who knew of such untruth.

All other terms and conditions of this policy remain unchanged.

**Policy No.: NPP682977          Effective:  8/9/2019**

RSG 202107 0118

# DIRECTORS AND OFFICERS LIABILITY
## COVERAGE SECTION (NON-PROFIT)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium, and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

### SECTION I. - INSURING AGREEMENTS

**Directors and Officers Liability**

**A.** With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss**.

**B.** With the **Insured Organization**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

**C.** With the **Insured Organization**, that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

### SECTION II. – COVERAGE EXTENSIONS

**A. Outside Board Extension**

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

**B. Additional Side-A Limit of Liability**

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section.  This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons.**

## SECTION III. - DEFINITIONS

**A. Claim,** either in the singular or the plural, means:

   **1.** A written demand for monetary or non-monetary relief;

   **2.** A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

   **a.** Receipt or service of a complaint or similar pleading;

   **b.** Return of an indictment or filing of information; or

   **c.** Receipt of a notice of charges;

   **3.** A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim,** commenced by the receipt of such request by the **Insured.**

**B. Employee** means any past, present or future employee of the **Insured Organization,** whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal, and temporary employee or volunteers of the **Insured Organization.** An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee,** but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C. Insured** means any **Insured Organization** and/or any **Insured Person.**

**D. Insured Person** means:

   **1.** Any past, present or future director, officer, trustee, **Employee,** advisory board member or any committee member of a duly constituted committee of the **Insured Organization;** or

   **2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E. Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses.** **Loss** (other than **Defense Expenses**) shall not include:

   **1.** Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds;**

   **2.** Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

   **3.** Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

   **4.** The cost of creating or reinstating employment;

   **5.** Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim;**

   **6.** Civil or criminal fines or penalties;

   **7.** Taxes, whether owed to or by any **Insured;**

   **8.** Amounts, including **Defense Expenses,** arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

   **9.** Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable

by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**F.   Personal Injury Wrongful Act** shall mean any actual or alleged:

1.   False arrest, wrongful detention or imprisonment, or malicious prosecution;

2.   Libel, slander, defamation of character or invasion of privacy;

3.   Wrongful entry, eviction or other invasion of the right of occupancy;

4.   Infringement of copyright or trademark or other unauthorized use of title; or

5.   Plagiarism or misappropriation of ideas.

However, **Personal Injury Wrongful Act** shall not include:

   a.   Publication or utterance concerning any organization or business enterprise or its products or services made by or at the direction of an **Insured** with knowledge of the falsity thereof; or

   b.   The printing of periodicals, advertising matter, or any or all jobs taken by any **Insured** to be printed for a third party when the periodical, advertising matter or other printing is not a regular part of the **Insured's** own activities.

**G.  Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty, or **Personal Injury Wrongful Act**, by:

1.   An **Insured Person** while acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2.   The **Insured Organization**.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1.   Based upon, arising out of or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to such **Insured** establishes that the **Insured** gained such profit or advantage;

2.   Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3.   Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

4.   Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5.   Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6.   For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7.   Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8.   For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws

referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9. Brought by or on behalf of any **Insured**, except:

   a. A derivative action brought by or made on behalf of, or in the name or right of, the **Insured Organization,** if such action is brought and maintained independently of, and without assistance, participation or intervention of any **Insured;**

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization;**

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c.; or

   d. Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization;**

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act.**

12. Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act.**

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Bankruptcy and Priority of Payments

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder.  The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons.**

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

   1. First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

   2. With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

   3. With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy.  If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof,** the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - MALPRACTICE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to any medical or professional malpractice, including but not limited to the rendering or failure to render any medical or professional service.

All other terms and conditions of this policy remain unchanged.

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (NON-PROFIT)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**A.  Employment Practices Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

**B.  Third Party Liability Coverage**

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

**Workplace Violence Expenses Sublimit**

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

**A.  Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

1.  A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

   a.  Receipt or service of a complaint or similar pleading;

   b.  Return of an indictment or filing of information; or

   c.  Receipt of a notice of charges;

2.  A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

3.  An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

**B.  Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal, and temporary employee or volunteers of the **Insured Organization**.  An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.  Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

**D.  Employment Practices Wrongful Act** means any actual or alleged:

1.  Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

2.  Employment related harassment (including but not limited to sexual harassment);

3.  Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

4.  Employment-related retaliation;

5.  Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

6.  Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

7.  Wrongful failure to employ or promote;

8.  Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

9.  Employment related wrongful discipline;

10.  Failure to grant tenure or practice privileges;

11.  Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

12.  Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

    a.  Family and Medical Leave Act of 1993;

    b.  Americans with Disabilities Act of 1992 (ADA);

    c.  Civil Rights Act of 1991;

    d.  Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

    e.  Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

13.  Violation of an **Insured Person's** civil rights relating to any of the above; or

14.  Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

**E.  Insured** means any **Insured Organization** and/or **Insured Person**.

**F.  Insured Person** means:

1.  Any past, present or future director, officer, trustee, **Employee**, advisory board member or any committee member of a duly constituted committee of the **Insured Organization**; or

2.  In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

G. **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

H. **Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

I. **Third Party** means any person(s) with whom an **Insured** interacts.

J. **Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

K. **Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

L. **Workplace Violence** means any intentional and unlawful act:

1. of deadly force involving the use of lethal weapon; or

2. the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

M. **Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

1. an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

2. an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

3. a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

4. independent security guard services for up to fifteen (15) days; and

5. an independent forensic analyst.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

2. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

   The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

   a. which occurs at any location other than the **Insured Organization's Premises**;

   b. arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

   c. that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

   d. resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5. Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

6. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

7. Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                              President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SUBLIMIT-DEFENSE EXPENSES – WAGE AND HOUR CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, this Policy shall allow up to $100,000 solely for **Defense Expenses** in connection with **Claims** made against any **Insured** for violation of the Fair Labor Standards Act or any similar state or local law or regulation specifically governing the payment of wages or hours worked ("**Wage and Hour Claim**").  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Employment Practices Liability Declarations Page, and shall not act to create coverage for any form of relief sought or available in any **Wage and Hour Claim**.

A Retention in the amount of         shall apply to any **Wage and Hour Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Defense Expenses** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

# FIDUCIARY LIABILITY COVERAGE SECTION (NON-PROFIT)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Fiduciary Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Fiduciary Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this Coverage Section shall be non-rescindable by the **Insurer**.

## SECTION II. – ADDITIONAL COVERAGES

The **Insurer** shall pay **Loss** arising from **Additional Claims** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy which result in **Loss** as described in the Additional Coverages as shown below.

Any Sublimits and Retentions set forth in the Fiduciary Liability Declarations Page for the Additional Coverage(s) shall apply separately and specifically to any **Loss** arising from the specified Additional Coverage(s). Such Retentions shall be borne by the **Insured Organization**, and the **Insurer** shall only be liable for the amount of **Loss** arising from the specified Additional Coverage(s) that is in excess of the specifically stated Retention amount applicable to such Additional Coverage, and subject to the applicable Sublimit.

**A. HIPAA Violations**

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act ("HIPAA").

**B. Voluntary Compliance Fees/Sanctions**

The definition of **Loss** is amended to include:

1. Any sanctions imposed upon an **Insured** as a fiduciary; or

2. Any compliance fees incurred by an **Insured**, under the Employee Plans Compliance Resolution System described in any applicable Internal Revenue Service Revenue Procedure ("EPCRS Sanctions/Fees").

**C. PPACA Civil Money Penalties**

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act, as amended ("PPACA"), and any rules or regulations promulgated thereunder.

**D. Plan Value Fiduciary Liability**

**Loss** is amended to include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits".

**E. Settlor Breaches of Duty**

**Loss** is amended to include amounts incurred arising from Settlor Breaches of Duty, meaning any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA**, COBRA, or HIPAA, in the discharge of any **Insured's** duties in a settlor capacity with respect to **Employee Benefits**.

**F. Other Penalties**

**Loss** is amended to include **Defense Expenses** resulting from any **Claim** arising out of:

1. the civil penalties under Section 502(c) of **ERISA**;

2. the civil penalties under the Pension Protection Act of 2006; and

3. the 15% or less tax penalty imposed upon an Insured under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments.

## SECTION III. – DEFINITIONS

A. **Additional Claims** means written demands or written allegations demanding relief as described in Section II., Additional Coverages, of this **Coverage Section**.

B. **Administration** means:

1. handling records in connection with **Employee Benefits**;

2. effecting enrollment, termination or cancellation of **Employees** under an **Employee Benefits** program;

3. giving counsel to **Employees** with respect to **Employee Benefits**; or

4. interpreting **Employee Benefits**.

C. **Claim** means a **Fiduciary Claim**.

D. **Employee** means any natural persons whose labor or service is engaged by and directed by the **Insured Organization**, including part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any independent contractor.

E. **Employee Benefits** means any **Plan** or **Healthcare Exchange**, and any workers' compensation insurance, unemployment insurance, Social Security or disability benefits for **Employees** of the **Insured Organization**.

F. **ERISA** means:

1. the Employee Retirement Income Security Act of 1974, as amended and any rules or regulations promulgated thereunder (including, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Heath Insurance Portability and Accountability Act of 1996 ("HIPAA"));

2. the English Pension Scheme Act of 1993, and the English Pensions Act of 1995, as such Acts are amended and any rules or regulations promulgated under such Acts, and

any similar statutory or common law anywhere in the world, and any rules or regulations promulgated thereunder, and

3. the privacy provisions under HIPAA.

G. **Fiduciary Claim** means a:

1. written demand for money or other civil relief commenced by the receipt of such demand;

2. civil proceeding, including any arbitration or other alternative dispute resolution proceeding commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

3. criminal proceeding commenced by the return of an indictment;

4. written notice of the commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation; or

5. formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar documents;

against an **Insured** for a **Fiduciary Wrongful Act**.

H. **Fiduciary Wrongful Act** means any actual or alleged:

1. breach of the duties, responsibilities or obligations imposed upon fiduciaries of any **Plan** by **ERISA** or the common law or statutory law of any jurisdiction governing such **Plan**; or

2. any negligent act, error or omission by an **Insured** in the **Administration** of **Employee Benefits** or any other matter claimed against an **Insured** solely by reason of their service as a fiduciary of any **Plan**.

3.  Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries of any **Plan** by the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); or

4.  Other violation of HIPAA claimed against an **Insured** due solely to such **Insured's** service as a fiduciary of any **Plan**; or

5.  Negligent violation of HIPAA by an **Insured** in the **Administration** of any **Plan**.

I.  **Healthcare Exchange** shall be any facility or vehicle set up to facilitate the purchase of health insurance in each state in accordance with the Patient Protection and Affordable Care Act.

J.  **Insured** means the **Insured Persons**, the **Plan** and the **Sponsor Organization**.

K.  **Insured Person** means any director, officer, trustee, partner or **Employee** of the **Plan** or of the **Sponsor Organization** while acting in his or her capacity as a fiduciary or settlor of the **Plan**.

L.  **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1.  Fines, penalties or taxes imposed by law, except that **Loss** may include claimant's attorney's fees awarded by a court pursuant to Section 502(g) of the Employee Retirement Income Security Act of 1974, as amended, against an Insured; civil penalties of up to five percent (5%) imposed pursuant to Section 502(i) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") for inadvertent violation of Section 406 of **ERISA**, and civil penalties of up to twenty percent (20%) of any settlement or judgment imposed pursuant to Section 502(l) of **ERISA** for breach of fiduciary duty;

2.  Benefits due or to become due under the terms of any **Plan**, unless and then only to the extent that recovery for such benefits is based on a **Fiduciary Wrongful Act** and is payable as the personal obligation of an **Insured** who is a natural person; provided that **Loss** shall include **Defense Expenses** with respect to any **Claim** seeking benefits due or to become due under the terms of any **Plan**; and **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits";

3.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

4.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

6.  The cost of creating or reinstating employment;

7.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

8.  Civil or criminal fines or penalties not expressly provided for in this **Coverage Section**;

9.  Taxes, whether owed to or by any **Insured**;

10. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

M.  **Pension Benefit Plan** means any employee pension benefit plan, as such term is defined in **ERISA**, which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

N.  **Plan** means any:

1.  **Pension Benefit Plan** and any trust established to hold the assets of any such **Pension Benefit Plan**;

2.  **Welfare Benefit Plan** which was, is now, or becomes sponsored solely by any **Sponsor Organization**;

3. **Pension Benefit Plan**, or any trust established to hold the assets of any such **Pension Benefit Plan**, created during the **Policy Period** by any **Sponsor Organization** or by any interest owned or controlled by such **Sponsor Organization** for the **Employees** thereof, but only if the Insured provides the Insurer with written notice of the creation of such **Pension Benefit Plan** within ninety (90) days of the effective date of such **Pension Benefit Plan**; and

4. otherwise covered **Plan** of any **Subsidiary** as that term is defined in the Common Policy Terms and Conditions SECTION III. - DEFINITIONS, M., or as allowed in the Common Policy Terms and Conditions SECTION V. – CONDITIONS, G., but only if the:

   (a) **Insured** provides the **Insurer** such additional information with respect thereto as the **Insurer** may reasonably require;

   (b) **Insured** provides the **Insurer** written notice of such acquisition as soon as practicable after the effective date thereof; and

   (c) **Insurer** specifically agrees by written endorsement to provide coverage with respect to such **Plan** and the **Insured** has accepted any additional terms, conditions and limitations of coverage, and agrees to pay any additional premium that the **Insurer** in its sole discretion, shall deem appropriate.

   **Plan** shall not include any multiemployer plan.

O. **Sponsor Organization** means the **Insured Organization** while acting in its capacity as a sponsor of a **Plan** solely for the benefit of its **Employees**.

P. **Welfare Benefit Plan** means any employee welfare benefit plan, as such term is defined in **ERISA** which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

## SECTION IV. - EXCLUSIONS

Specifically with respect to **Fiduciary Claims** or **Additional Claims**, exclusions in this endorsement shall govern in the event of any specific conflict between them and other exclusions in the policy.

The **Insurer** shall not be liable to make any payment for **Loss**, and shall have no duty to defend or pay **Defense Expenses**, in connection with any **Fiduciary Claim** made against any **Insured**:

1. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Fiduciary Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which was brought prior to the date referenced in Item 4. of the Fiduciary Liability Declarations Page;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure by any **Insured** to comply with any law, rule or regulation concerning workers' compensation insurance, unemployment insurance, Social Security or disability benefits, whether or not such failure to comply is willful;

3. For the failure to collect contributions owed to any **Plan** from any employer unless such failure is due to the negligence of an **Insured,** or for the return to any employer of any contributions if such amounts are or could be chargeable to a **Plan**; provided, this EXCLUSION 3. shall not apply to the **Insurer's** obligations, subject to the applicable Limit of Liability, to defend such **Fiduciary Claim** and to pay **Defense Expenses** resulting therefrom;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to Loss arising from a Claim for employment related retaliation;

5. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

6. Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

7. Made by or on behalf of a fidelity insurer against a natural person whose conduct has resulted in a **Loss** which has been paid under a fidelity bond; or

8. Based upon, arising out of, directly or indirectly resulting from any discrimination, retaliation or wrongful termination of employment; provided, this EXCLUSION 8. will not apply to **Fiduciary Claims** asserted under Section 510 of **ERISA**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## SECTION V. - CONDITIONS

### A. Coverage for New Plans

If during the **Policy Period** the **Insured**:

1. forms or acquires an employee welfare benefit plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured**; this **Coverage Section** shall automatically apply; or

2. forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are less than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date; this **Coverage Section** shall automatically apply; or

3. forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured** or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are equal to or greater than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date, then coverage is provided under this **Coverage Section**, but only upon the condition that within ninety (90) days of it becoming an **Employee Benefits** plan, the **Insured** provides the **Insurer** with full particulars of the new **Employee Benefits** plan and agrees to any additional premium and/or amendment of the provisions of this **Coverage Section** required by the **Insurer** related to such new **Employee Benefits** plan. Further, coverage as shall be afforded to the new **Employee Benefits** plan is conditioned upon the **Insured** paying when due any additional premium required by the **Insurer** relating to such new **Employee Benefits** plan.

In all events, coverage as afforded with respect to this Section V.A. shall not apply to a Multi Employer Plan, a Multiple Employer Plan, or a Defined Benefit Plan.

### B. Recourse

It is agreed that, in the event an **Insured** breaches a fiduciary obligation under **ERISA**, the **Insurer** has the right of recourse against any such **Insured** for any amount paid by the **Insurer** as a result of such breach of fiduciary duty, but the **Insurer** shall have no such right of recourse if the policy has been purchased by the fiduciary or by an employer or an employee organization.

### C. Termination of Plan

If the **Sponsor Organization** terminates a **Plan**, coverage shall be afforded under this coverage extension with respect to such terminated **Plan** and its **Insureds**. Such continuation of coverage shall apply with respect to **Fiduciary Claims** for **Fiduciary Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to or after the date the **Plan** was terminated.

**In Witness Whereof,** the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer.**

Secretary

President

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY
RENEWAL APPLICATION**



**NOTICE:**   **THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE CLAIMS FIRST
MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER
DURING THE POLICY PERIOD, OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE.  THE
LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED OR TOTALLY EXHAUSTED
BY PAYMENT OF DEFENSE EXPENSES.**

## I.  GENERAL INFORMATION SECTION

1.  (a) Name of Organization:

Highland-Clarksburg Hospital, Inc.

(b) Organization Address:

3 Hospital Plaza Clarksburg WV 26301

2.  Indicate Coverage and Limit Requested:

| | | | |
|---|---|---|---|
| D&O Liability Insurance Coverage: | Yes ☒ | No ☐ | Limit Requested: $ 2,000,000 |
| Employment Practices Liability Coverage: | Yes ☒ | No ☐ | Limit Requested: $ 2,000,000 |
| Third Party Liability Coverage: | Yes ☒ | No ☐ | |
| Fiduciary Liability Insurance Coverage: | Yes ☒ | No ☐ | Limit Requested: $ 1,000,000 |

3.  Indicate the Type of Limit Requested:

☒  Shared Limit of Liability for multiple Coverage Sections

☐  Separate Limit of Liability for each Coverage Section

☐  Combination of Shared and Separate Limits (provide details): _____

4.  Please provide the following financial information for the Applicant and its Subsidiaries:

| | Current Year | Prior Year |
|---|---|---|
| Date of Financial Statement: | | |
| Total Assets: | $ | |
| Total Liabilities: | $ | |
| Fund Balance: | $ | |
| Total Revenues: | $ | |
| Net Income or Net Loss: | $ | |

5. As part of this Application, please submit the following with respect to the Applicant:

*Directors & Officers Liability Coverage:*

√(a) COMPLETE COPY OF LATEST ANNUAL REPORT. IF AUDITED FINANCIALS, PLEASE INCLUDE AUDITORS NOTES AND A COPY OF LATEST INTERIM FINANCIAL STATEMENT

√(b) CURRENT LIST OF DIRECTORS AND OFFICERS

√(c) COMPLETE COPY OF BY LAWS AND ARTICLES OF INCORPORATION

*Employment Practices Liability Coverage:*

N/A(a) EEO-1 REPORT (IF REQUIRED BY FEDERAL LAW)

√(b) EMPLOYEE HANDBOOK

*Fiduciary Liability Coverage:*

√(a) A COPY OF THE MOST RECENTLY FILED FORM 5500 OR MOST RECENT AUDITED PLAN FINANCIAL STATEMENTS

---

## II.  DIRECTORS & OFFICERS LIABILITY SECTION *(Please complete only if coverage requested)*

1.  (a) Have there been any changes in the Organization operations within the last twelve (12) months or is the Organization currently contemplating any merger or acquisition? If "Yes", please provide details on a separate page.　　Yes ☐　No ☒

　　(b) Has the Organization acquired or created any Subsidiaries within the last twelve (12) months? If "Yes", please provide details on a separate page.　　Yes ☐　No ☒

2.  Does the organization have an incident response plan for data breaches that is tested at least annually?　　Yes ☒　No ☐
    If "No", please provide details on a separate page.

3.  If applicable, is the organization Payment Card Industry Data Security Standard (PCI/DSS) compliant?　　Yes ☒　No ☐
    If "No", please provide details on a separate page.

4.  Does the organization purchase First Party and Third Party Network Security and Privacy Insurance Coverage?　*cyber insurance*　　Yes ☒　No ☐

5.  If applicable, is the organization Health Insurance Portability & Accountability Act (HIPAA) / Health Information Technology for Economic & Clinical Health (HITECH) compliant?　　Yes ☒　No ☐
    If "No", please provide details on a separate page.

6.  Does the organization receive more than 10% of their revenues from any governmental source?　　Yes ☒　No ☐

7.  Does the organization offer, sell, advertise, market or solicit any product or service, or debt collection, employing any automatic/robo dialing, mobile phone texting, faxing, or any other type of communications based mechanism or strategy governed under the rules and regulations of the Telephone Consumer Protection Act of 1991 (TCPA), The Fair Debt Collection Practices Act or any laws governing unsolicited advertising or contacts for collections or promotion of goods or services?　　Yes ☐　No ☒

8.  Does the organization have a contract or agreement with any third party vendor to perform the above services on their behalf?　*debt collection agency*　　Yes ☒　No ☐

## III. EMPLOYMENT PRACTICES LIABILITY SECTION *(Please complete only if coverage requested)*

| 1. Number of Employees: | Full time: | Part time: | Independent Contractors: | Volunteers: | Total: |
|---|---|---|---|---|---|
| | 285 | 36 | 4 | 2 | 327 |

2. List total number of Employees in the following states:

   CA ___∅___   FL ___∅___   NJ ___∅___   NY ___∅___   TX ___∅___

3. Does the Organization anticipate making any reductions in the work force within the next twelve (12) months?   Yes ☐   No ☒
   If "Yes", please provide details on a separate page.

4. How many Employees or Officers have been terminated within the last twelve (12) months?
   Number of Employees: ___135___   Number of Officers: ___3___

## IV. FIDUCIARY LIABILITY SECTION *(Please complete only if coverage requested)*

1. Has any plan (a) been amended within the last 12 months in a way that will result in the reduction of benefits or are any such amendments anticipated within the next 12 months; or (b) been merged with another plan, terminated or sold within the past 2 years or is any such merger, Termination, sale or freezing anticipated in the next 12 months?   Yes ☐   No ☒
   If "Yes", please provide details of implementation, disclosure and any relevant blackout periods.

2. Does any plan invest in a mutual fund, collective trust or similar investment pool that receives investment management services from the Organization for a fee?   Yes ☐   No ☒
   If "Yes":
   How often are these fees reviewed by the trustees for fairness? _____
   Are these fees disclosed to participants?   Yes ☐   No ☐

3. Are any Plans non-compliant with plan agreements or ERISA?
   If "Yes", please provide details on a separate page.   Yes ☐   No ☒

The undersigned authorized Officer of the Organization, on behalf of the Organization and its Subsidiaries, and on behalf of the Directors and Officers of the Organization and its Subsidiaries declares that to the best of his/her knowledge and belief, the information, particulars, documents, representations and statements contained in, attached or referred to in this application for insurance and/or as a result of the underwriting process are true and accurate and recognizes that the Insurer, in issuing this policy, will rely on such information, particulars, documents, representations and statements.

Although the signing of this application does not bind the undersigned to effect insurance, the undersigned agrees, on behalf of the Organization and its Subsidiaries, and on behalf of the Directors and Officers of the Organization and its Subsidiaries, that the information, particulars, documents, representations and statements contained in, attached or referred to in this application for insurance and/or as a result of the underwriting process shall be the basis of the contract should a policy be issued and that this application will be attached to and will become part of such policy.  The Insurer is hereby authorized to make any investigation and inquiry it deems necessary in connection with this application.

NOTE:   This application must be signed by the Chairman of the Board, President or Executive Director and dated within thirty (30) days of the effective date of coverage.
The undersigned authorized Officer agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, he/she (undersigned) will immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

Signature _____     Title _____Chief Executive Officer_____
(Chairman of the Board, President or Executive Director)

Date ____7/24/2019____     Organization _Highland-Clarksburg Hospital, Inc._

Submitted By _____     Date _____
(Producer)

## SIGNATURE REQUIRED
### NEW YORK FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

_____     _____
Applicant's Signature                    Date

### No Signature Required

### ARKANSAS, LOUISIANA, RHODE ISLAND, TEXAS AND WEST VIRGINIA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### ALABAMA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

### ALASKA FRAUD STATEMENT

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### ARIZONA FRAUD STATEMENT

For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

### CALIFORNIA FRAUD STATEMENT

For your protection, California law requires that you be made aware of the following: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

## DELAWARE FRAUD STATEMENT

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

## DISTRICT OF COLUMBIA FRAUD STATEMENT

**WARNING:** It is a crime to provide false, or misleading information to an insurer for the purpose of defrauding the insurer or any other person.  Penalties include imprisonment and/or fines.  In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

## FLORIDA FRAUD STATEMENT

Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

## HAWAII FRAUD STATEMENT

For your protection, Hawaii law requires you to be informed that any person who presents a fraudulent claim for payment of a loss or benefit is guilty of a crime punishable by fines or imprisonment, or both.

## IDAHO FRAUD STATEMENT

Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

## INDIANA FRAUD STATEMENT

Any person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

## KANSAS FRAUD STATEMENT

Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

## KENTUCKY FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

## MAINE FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

## MARYLAND FRAUD STATEMENT

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

## MINNESOTA FRAUD STATEMENT

Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

## NEW HAMPSHIRE FRAUD STATEMENT

Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

### NEW JERSEY FRAUD STATEMENT

Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

### NEW MEXICO FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

### OHIO FRAUD STATEMENT

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### OKLAHOMA FRAUD STATEMENT

**WARNING:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

### OREGON FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

### PENNSYLVANIA FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### PUERTO RICO FRAUD STATEMENT

Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties.  Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

### TENNESSEE, VIRGINIA, AND WASHINGTON FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

# EXHIBIT 6



**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA 30326-1160

# NON-PROFIT ORGANIZATION
# MANAGEMENT LIABILITY POLICY

**NOTICE:**   THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

**PLEASE READ YOUR POLICY CAREFULLY**

## CLAIM NOTICE

**Mail notices to:**   **RSUI Group, Inc.**
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

**Fax notices to:**   **(404) 231-3755**
**Attn: Claims Department**

**E-mail notices to:**   **reportclaims@rsui.com**

**RSUI's Panel Counsel Finder:**   **Panel Counsel Link**

*A member of Alleghany Insurance Holdings LLC*

RSG 211008 0118

## NON-PROFIT ORGANIZATION COMMON POLICY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| N | PP688510 | NPP682977 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME AND MAILING ADDRESS                PRODUCER'S NAME AND ADDRESS

HIGHLAND-CLARKSBURG HOSPITAL, INC.
3 HOSPITAL PLAZA
CLARKSBURG, WV 26301

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM ___8/9/2020___ TO ___8/9/2021___ 12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

|  | Purchased | Shared Limit | Separate Limit |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
| B.  Employment Practices Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |
|    1)  Third Party Liability Coverage | ☒ Yes ☐ No |  |  |
| C.  Fiduciary Liability Insurance | ☒ Yes ☐ No | ☒ | ☐ |

**ITEM 4. LIMIT OF LIABILITY:**

$ ___2,000,000___  Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$ _____  Total Policy Premium for All Coverage Sections

| + WV Fire Protection Surcharge |
|---|

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS -- RSG 210077 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____   ___August 04, 2020___   _____
                                                              DATE                  AUTHORIZED REPRESENTATIVE

# NON-PROFIT ORGANIZATION DIRECTORS AND OFFICERS LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP688510 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**  INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

**ITEM 2. LIMIT OF LIABILITY:**

A.  Directors and Officers Limit of Liability     $ 2,000,000

B.  Additional Side-A Limit of Liability     $ 500,000

**ITEM 3. RETENTION:**

A. Directors and Officers Liability Retentions

1)  Insuring Agreement A     $ _____

2)  Insuring Agreement B     $ _____

3)  Insuring Agreement C     $ _____

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Directors and Officers Prior and/or Pending Litigation Date:     10/01/2012

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____  August 04, 2020 _____  _____

                                            DATE                          AUTHORIZED REPRESENTATIVE

## NON-PROFIT ORGANIZATION EMPLOYMENT PRACTICES LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP688510 |

### ●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

**ITEM 2. LIMIT OF LIABILITY:**

   A.   Employment Practices Limit of Liability        $ 2,000,000
       (Including Third Party Liability, if purchased)
   B.   Workplace Violence Expenses Sublimit        $ 250,000

**ITEM 3. RETENTION:**

   A.   Employment Practices Liability Retentions
     1)   Employment Practices Liability       $
     2)   Third Party Liability Coverage       $

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

   Employment Practices Prior and/or Pending Litigation Date:   10/01/2012

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____      August 04, 2020        _Kym Hadfield_
                                  DATE           AUTHORIZED REPRESENTATIVE

# NON-PROFIT ORGANIZATION FIDUCIARY LIABILITY DECLARATIONS



Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| N | PP688510 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   RSUI Indemnity Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

HIGHLAND-CLARKSBURG HOSPITAL, INC.

**ITEM 2. LIMIT OF LIABILITY:**

Fiduciary Limit of Liability                                    $  1,000,000

**ITEM 3. RETENTION:**

Fiduciary Liability Retention                                 $ _____

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Fiduciary Liability Prior and/or Pending Litigation Date:    08/19/2013

**ITEM 5. FIDUCIARY LIABILITY ADDITIONAL COVERAGES:**

| ADDITIONAL COVERAGES | SUBLIMIT | RETENTION | PRIOR/PENDING LITIGATION DATE |
|---|---|---|---|
| ☒HIPAA Violations | $25,000 | | 08/19/2015 |
| ☒Voluntary Compliance Fees or Sanctions | $100,000 | | 08/19/2015 |
| ☒PPACA Civil Money Penalties | $25,000 | | 08/19/2015 |
| ☐Plan Value Fiduciary Liability | N/A | | N/A |
| ☐Settlor Breaches of Duty | N/A | | N/A |
| ☐Other Penalties | N/A | | N/A |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____          August 04, 2020          _Kym Hadgek_
                                                  DATE                  AUTHORIZED REPRESENTATIVE

## NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
## SUPPLEMENTAL DECLARATIONS



POLICY NUMBER:   NPP688510

SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|-------|-------------|
| West Virginia Changes-Extended Reporting Period | RSG 202078 0118 |
| West Virginia Changes-Cancellation and Nonrenewal | RSG 203035 0118 |
| Disclosure Pursuance to Terrorism Risk Insurance Act | RSG 204123 0116 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Non-Profit | RSG 211003 0118 |
| Amended Definition of Loss-Defense Claims for ADA | RSG 214076 0118 |
| Class Action Retention | RSG 204181 0118 |
| Coverage Extension-Healthcare Organization | RSG 214078 0118 |
| Coverage Extension-HIPAA | RSG 214077 0118 |
| Exclusion-Amended Bodily Injury and Property Damage | RSG 206118 0119 |
| Exclusion-Biometric Privacy Claims | RSG 206125 0120 |
| Exclusion-Prior Acts | RSG 206108 0118 |
| Exclusion-Prior and or Pending Litigation Backdated-Higher Limits | RSG 206070 0118 |
| Exclusion-Sexual Misconduct and Child Abuse | RSG 206076 0118 |
| Exclusion-Specific Entities and Individuals | RSG 206114 0118 |
| Fully Non-Rescindable Coverage | RSG 204157 0119 |
| West Virginia-Full Severability | RSG 202107 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Non-Profit | RSG 211009 0118 |
| Exclusion-Malpractice | RSG 206107 0118 |
| **FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY** | |
| Employment Practices Liability Coverage Section-Non-Profit | RSG 211010 0118 |
| Sublimit-Defense Expenses-Wage and Hour Claims | RSG 204153 0118 |
| **FORMS APPLICABLE TO FIDUCIARY LIABILITY** | |
| Fiduciary Liability Coverage Section-Non-Profit | RSG 211011 0118 |

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA CHANGES – EXTENDED REPORTING PERIOD

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – COVERAGE EXTENSIONS, B. Extended Reporting Period of the Common Policy Terms and Conditions Coverage Section, the last paragraph is deleted and replaced by the following:

**B.  Extended Reporting Period**

The rights contained in this clause shall apply in the event of cancellation resulting from non-payment of premium but only after the **Insured Organization** has paid the earned premium balance due.

All other terms and conditions of this policy remain unchanged.

**Policy No.:  NPP688510      Effective:** 8/9/2020

RSG 202078 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The provision in SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section which indicates that proof of mailing will be sufficient notice is deleted.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  NPP688510      **Effective:**  8/9/2020

RSG 203035 0118

**RSUI INDEMNITY COMPANY**

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT.  THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE*

| | |
|---|---|
| Terrorism Premium | $0 |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.

**A.   Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.  The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B.   Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.   Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses that exceeds the applicable **Insurer** retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C.   Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate **Insured** losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**Policy No.:** NPP688510      **Effective:** 8/9/2020

RSG 204123 0116

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

### NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY
### PRIVATE COMPANY MANAGEMENT LIABILITY POLICY

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 204198 0118



# *www.RSUIextra.com*

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

## Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
  - Preventing Sexual Harassment
  - Preventing Discrimination
  - Preventing Wrongful Termination
  - Promoting Ethical Behavior

## How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to *www.RSUIextra.com*.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit*.
6. You are now registered as the Site Administrator.

## Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of *www.RSUIextra.com*.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

## Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at *www.RSUIextra.com* on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

# COMMON POLICY TERMS AND CONDITIONS
## COVERAGE SECTION (NON-PROFIT)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**.  Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy.  If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

## SECTION II. - COVERAGE EXTENSIONS

### A.  Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B.  Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C.  Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

## SECTION III. – DEFINITIONS

**A.** **Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

**B.** **Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**C.** **Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

**D.** **Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

1. Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

2. Any obligation to apply for or furnish any appellate or similar bond.

**E.** **Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**F.** **Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

**G.** **Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**H.** **Insured Organization** means:

1. The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

2. Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

3. In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

**I.** **Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**J.** **Insurer** means the Company providing this insurance as shown on the Declarations Page.

**K.** **Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**L.** **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

**M.** **Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

1. Owns more than fifty percent (50%) of the voting interest; or

2. Has the right to elect or appoint more than fifty percent (50%) of the voting directors or trustees.

A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting interest, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, or trustees, either directly or indirectly, or through one or more of its **Subsidiaries**.

**N.** **Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   a. Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   b. Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

      (1) The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (2) The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

      (3) The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

      (4) Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld. Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy. The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which such **Claim** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

**1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**.  **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

**2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**.  Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

**3.** As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified.  The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

**4.** All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

**5.** In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

**6.** Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person,** provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

**7.** The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

**8.** Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

**1.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

2. If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

   a. The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

   b. The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

   Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

**D. Cooperation**

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

**E. Allocation**

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non-covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

**F. Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G.   Merger, Consolidation or Acquisition**

1.   If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2.   If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization**, unless:

   a.   Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b.   The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c.   The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d.   The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3.   If during the **Policy Period**:

   a.   The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b.   Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

      (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H.   Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I.   No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J.  Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K.  Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L.  Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy.  The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M.  Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N.  Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O.  Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P.  Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q.  Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R.  Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy.  Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.


Secretary                                                                   President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED DEFINITION OF LOSS – DEFENSE CLAIMS FOR ADA

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**

A.  SECTION III. – DEFINITIONS, E. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

    **E.  Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**.  **Loss** (other than **Defense Expenses)** shall not include:

        1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

        2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

        3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

        4.  The cost of creating or reinstating employment;

        5.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim;**

        6.  Civil criminal fines or penalties;

        7.  Taxes, whether owed to or by any **Insured**;

        8.  Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar;

        9.  Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

    The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

B.  SECTION III. – DEFINITIONS, G. of the Employment Practices Liability Coverage Section is deleted and replaced by the following:

    **G.  Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**.  **Loss** (other than **Defense Expenses)** shall not include:

        1.  Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

        2.  Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

        3.  Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

        4.  The cost of creating or reinstating employment;

        5.  Any amounts owed to any **Employee** as wages or compensation previously incurred or vested

without regard to any **Claim**;

6.  Civil criminal fines or penalties;

7.  Taxes, whether owed to or by any **Insured**;

8.  Any liability, or costs incurred, due to any **Insured's** obligation to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9.  Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable.  For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## CLASS ACTION RETENTION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Declarations Page:

**ITEM 7. RETENTION:**

$ _____   Each claim for an actual or putative class action

All other terms and conditions of this policy remain unchanged.

RSG 204181 0118

**Policy No.:** NPP688510     **Effective:** 8/9/2020

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy. Please Read It Carefully.*

# COVERAGE EXTENSION – HEALTHCARE ORGANIZATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**

A.  SECTION III. - DEFINITIONS **D. Insured Person** in the Directors and Officers Liability Coverage Section and **F. Insured Person** in the Employment Practices Liability Coverage Section is amended to include the following:

**Insured Person** shall include any past, present or future member of any duly constituted committee ("Committee Member"), any individual person engaged by a duly constituted committee for purposes of providing an expert opinion with regard to peer review or credentialing decision concerning an individual physician ("Outside Expert"), any individual in charge of any operational department ("Department Head") or any staff physician or faculty member of the **Insured Organization**, regardless of whether they are considered as an **Employee** of the **Insured Organization** or an independent contractor.

B.  SECTION III. - DEFINITIONS **E. Loss** in the Directors and Officers Liability Coverage Section and **G. Loss** in the Employment Practices Liability Coverage Section is amended to include the following:

1.  **IRS Fines**

    **Loss** shall include **Defense Expenses** incurred in connection with a **Claim** seeking an assessment of taxes, initial taxes, additional taxes, tax deficiencies, excise taxes or penalties pursuant to the following sections of the Internal Revenue Code of 1986 (as amended):

    Section 4911 (tax on excess expenditures to influence legislation);

    Section 4940 (a) (tax on net investment income of tax-exempt foundations);

    Section 4941 (taxes on self-dealing);

    Section 4942 (taxes on failure to distribute income);

    Section 4943 (taxes on excess business holding);

    Section 4944 (taxes on investments which jeopardize charitable purpose);

    Section 4945 (taxes on taxable expenditures);

    Section 6652 (c) (1) (A) and (B) (penalties for failure to file certain information returns or registration statements);

    Section 6655 (a) (1) (penalties for failure to pay estimated income tax); and

    Section 6656 (a) and (b) (penalties for failure to make deposit of taxes).

2.  **Excess Benefit Penalty Coverage**

    **Loss** shall include the ten percent (10%) "Excess Benefit" penalty which might be assessed by the Internal Revenue Service against any individual **Insured Person** for management involvement in the award of an "Excess Benefit".

    No coverage shall be provided by this policy for any individual **Insured Person** subject to the twenty five percent (25%) "Excess Benefit" penalty assessed by the Internal Revenue Service against any such **Insured Person** as a "disqualified person"; provided, however, that **Defense Expense** incurred in connection with the twenty five percent (25%) "Excess Benefit" penalty shall be provided to such **Insured Person**.

    Under no circumstances shall the **Insurer** be liable for the payment of **Loss** attributable to any two hundred percent (200%) penalty assessed by the Internal Revenue Service for failure to correct the award of an "Excess Benefit."

---

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 214078 0118                                                                                          Page 1 of 2

For purposes of this endorsement, the terms "Excess Benefit" and "disqualified person" shall be defined in the "Taxpayer Bill of Rights 2", (H.R. 2337, P.L. 104–168).

3. **EMTALA Coverage**

   **Loss** shall include the fines, penalties and **Defense Expenses** resulting from any **Claim** arising out of or in connection with an actual or alleged violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C., 1396dd et seq., and any similar state or local statute.

4. **Government Funding Defense Expense Coverage**

   **Loss** shall not include the return of funds which were received from any federal, state or local governmental agency; provided, however, that with respect to any **Claim** arising out of the return or request to return, such funds, and subject to a Retention amount of            the **Insurer** shall pay **Defense Expenses** up to a total of $1,000,000 incurred by the **Insured** on a fifty percent (50%) coinsurance basis, with fifty percent (50%) of such **Defense Expenses** to be borne by the **Insured** and to remain uninsured; and the remaining fifty percent (50%) of such **Defense Expenses** to be covered by the **Insurer** subject to all other terms, conditions and exclusions of this policy.

   Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# COVERAGE EXTENSION - HIPAA

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**

SECTION III. – DEFINITIONS, **E. Loss** of the Directors and Officers Liability Coverage Section and **G. Loss** of the Employment Practices Liability Coverage Section shall be amended by adding the following:

Notwithstanding anything in this DEFINITION to the contrary, **Loss** shall include any civil money penalties imposed upon an **Insured** for violation of Title II of the Health Insurance Portability and Accountability Act ("HIPAA"), amendments to such law or regulations promulgated under such law concerning privacy of health information; provided the **Insurers** maximum aggregate Limit of Liability for all such civil money penalties on account of all **Claims** first made during the **Policy Period** shall be $25,000.  This sublimit shall be one sublimit only, regardless of the number of Coverage Sections purchased by any or all **Insureds,** and shall be part of and not in addition to the amount set forth in Item 4. of the Common Policy Declarations Page.

A Retention in the amount of            , shall apply to any **Loss** arising from a **Claim** alleging violation of HIPAA.  Such retention shall be borne by the **Insured,** and the **Insurer** shall only be liable for the amount of **Loss** arising from a HIPAA **Claim** which is in excess of the above stated retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim,** and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510      **Effective:** 8/9/2020

RSG 214077 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – AMENDED BODILY INJURY AND PROPERTY DAMAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced with the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

B.  The first paragraph of SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced with the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 206118 0119

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BIOMETRIC PRIVACY CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information**.

For the purpose of this endorsement, **Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510      **Effective:** 8/9/2020

RSG 206125 0120

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to October 01, 2012.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510      **Effective:** 8/9/2020

RSG 206108 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR AND/OR PENDING LITIGATION BACKDATED (HIGHER LIMITS)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. - EXCLUSIONS, 4. of the Directors and Officers Liability Coverage Section, 1. of the Employment Practices Liability Coverage Section and 1. of the Fiduciary Liability Coverage Section are deleted and replaced with the following:

Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or pending as of October 01, 2012 for $1,000,000, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation.

With respect to the portion of the Limit of Liability that is $1,000,000 excess $1,000,000, the **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** arising out of, based upon or attributable to, in whole or in part, litigation prior to or pending as of August 09, 2007.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 206070 0118

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SEXUAL MISCONDUCT AND CHILD ABUSE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and the Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** (including but not limited to any derivative or representative class actions) made against any **Insured** alleging, arising out of, based upon or attributable to or in any way involving, directly or indirectly, any **Sexual Misconduct**, child abuse or neglect, including but not limited to the employment, supervision, reporting to the proper authorities, failure to so report or retention of any person.

**Sexual Misconduct** means any licentious, immoral or sexual behavior, sexual abuse, sexual assault or molestation or any sexual act against any individual.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 206076 0118

RSUI INDEMNITY COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - SPECIFIC ENTITIES AND INDIVIDUALS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. -- EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** which is brought by or on behalf of the following entities or individuals:

HHA, Inc.

including, but not limited to any **Claim** brought by any director, officer, heir, trustee or partner of the entity, or by any security holder thereof, whether such **Claim** is brought directly or derivatively.

All other terms and conditions of this policy remain unchanged.

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## FULLY NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this policy shall be non-rescindable by the **Insurer**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:**  8/9/2020

RSG 204157 0119

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# WEST VIRGINIA - FULL SEVERABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, H. Representations of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

## H.  Representations

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy.  This policy is issued in reliance upon the truth of such representations.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**.  If any of the information, particulars, documents, representations and statements of material fact contained in the **Application** are untrue, this policy shall not afford coverage to any **Insured** who knew of such untruth.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 202107 0118

# DIRECTORS AND OFFICERS LIABILITY
## COVERAGE SECTION (NON-PROFIT)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium, and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### Directors and Officers Liability

**A.** With the **Insured Person,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

**B.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person.**

**C.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer.**

## SECTION II. – COVERAGE EXTENSIONS

### A. Outside Board Extension

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

### B. Additional Side-A Limit of Liability

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section.  This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons.**

## SECTION III. - DEFINITIONS

A. **Claim**, either in the singular or the plural, means:

  1. A written demand for monetary or non-monetary relief;

  2. A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

      a. Receipt or service of a complaint or similar pleading;

      b. Return of an indictment or filing of information; or

      c. Receipt of a notice of charges;

  3. A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured.**

B. **Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal, and temporary employee or volunteers of the **Insured Organization.** An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

C. **Insured** means any **Insured Organization** and/or any **Insured Person.**

D. **Insured Person** means:

  1. Any past, present or future director, officer, trustee, **Employee**, advisory board member or any committee member of a duly constituted committee of the **Insured Organization**; or

  2. In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

E. **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses.** **Loss** (other than **Defense Expenses**) shall not include:

  1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

  2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

  3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

  4. The cost of creating or reinstating employment;

  5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

  6. Civil or criminal fines or penalties;

  7. Taxes, whether owed to or by any **Insured**;

  8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

  9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable

by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**F. Personal Injury Wrongful Act** shall mean any actual or alleged:

    **1.** False arrest, wrongful detention or imprisonment, or malicious prosecution;

    **2.** Libel, slander, defamation of character or invasion of privacy;

    **3.** Wrongful entry, eviction or other invasion of the right of occupancy;

    **4.** Infringement of copyright or trademark or other unauthorized use of title; or

    **5.** Plagiarism or misappropriation of ideas.

However, **Personal Injury Wrongful Act** shall not include:

    **a.** Publication or utterance concerning any organization or business enterprise or its products or services made by or at the direction of an **Insured** with knowledge of the falsity thereof; or

    **b.** The printing of periodicals, advertising matter, or any or all jobs taken by any **Insured** to be printed for a third party when the periodical, advertising matter or other printing is not a regular part of the **Insured's** own activities.

**G. Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty, or **Personal Injury Wrongful Act**, by:

    **1.** An **Insured Person** while acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

    **2.** The **Insured Organization**.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

**1.** Based upon, arising out of or attributable to the gaining by any **Insured** of any profit or advantage to which such **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to such **Insured** establishes that the **Insured** gained such profit or advantage;

**2.** Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

**3.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

**4.** Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

**5.** Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

**6.** For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

**7.** Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

**8.** For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws

referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9. Brought by or on behalf of any **Insured**, except:

   a. A derivative action brought by or made on behalf of, or in the name or right of, the **Insured Organization,** if such action is brought and maintained independently of, and without assistance, participation or intervention of any **Insured;**

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization,** in or after any bankruptcy proceeding by or against an **Insured Organization;**

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c.; or

   d. Any instigation of or involvement in any **Claim,** or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization;**

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act.**

12. Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act.**

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Bankruptcy and Priority of Payments

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder.  The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons.**

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

1. First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

2. With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss,** pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

3. With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss,** pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy.  If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof,** the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer.**

Secretary

President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION - MALPRACTICE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to any medical or professional malpractice, including but not limited to the rendering or failure to render any medical or professional service.

All other terms and conditions of this policy remain unchanged.

# EMPLOYMENT PRACTICES LIABILITY
# COVERAGE SECTION (NON-PROFIT)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**A. Employment Practices Liability**

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

**B. Third Party Liability Coverage**

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

**Workplace Violence Expenses Sublimit**

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

**A. Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

1.  A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

    **a.** Receipt or service of a complaint or similar pleading;

    **b.** Return of an indictment or filing of information; or

    **c.** Receipt of a notice of charges;

2.  A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

3.  An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

**B.** **Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal, and temporary employee or volunteers of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.** **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

**D.** **Employment Practices Wrongful Act** means any actual or alleged:

1.  Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

2.  Employment related harassment (including but not limited to sexual harassment);

3.  Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

4.  Employment-related retaliation;

5.  Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

6.  Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

7.  Wrongful failure to employ or promote;

8.  Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

9.  Employment related wrongful discipline;

10. Failure to grant tenure or practice privileges;

11. Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

12. Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

    a.  Family and Medical Leave Act of 1993;

    b.  Americans with Disabilities Act of 1992 (ADA);

    c.  Civil Rights Act of 1991;

    d.  Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

    e.  Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

13. Violation of an **Insured Person's** civil rights relating to any of the above; or

14. Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

**E.** **Insured** means any **Insured Organization** and/or **Insured Person**.

**F.** **Insured Person** means:

1.  Any past, present or future director, officer, trustee, **Employee**, advisory board member or any committee member of a duly constituted committee of the **Insured Organization**; or

2.  In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**G.** **Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**H.** **Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

**I.** **Third Party** means any person(s) with whom an **Insured** interacts.

**J.** **Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**K.** **Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

**L.** **Workplace Violence** means any intentional and unlawful act:

1. of deadly force involving the use of lethal weapon; or

2. the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**M.** **Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

1. an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

2. an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

3. a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

4. independent security guard services for up to fifteen (15) days; and

5. an independent forensic analyst.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

2. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

   The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

   a. which occurs at any location other than the **Insured Organization's Premises**;

   b. arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

   c. that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

   d. resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5. Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

6. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

7. Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof,** the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

**RSUI INDEMNITY COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## SUBLIMIT-DEFENSE EXPENSES – WAGE AND HOUR CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Employment Practices Liability Coverage Section:

The amount set forth in Item 4. of the Common Policy Declarations Page shall be the maximum aggregate Limit of Liability for all **Loss** under this policy.  Subject to the foregoing, this Policy shall allow up to $100,000 solely for **Defense Expenses** in connection with **Claims** made against any **Insured** for violation of the Fair Labor Standards Act or any similar state or local law or regulation specifically governing the payment of wages or hours worked ("**Wage and Hour Claim**").  This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Employment Practices Liability Declarations Page, and shall not act to create coverage for any form of relief sought or available in any **Wage and Hour Claim.**

A Retention in the amount of            shall apply to any **Wage and Hour Claim**.  Such Retention shall be borne by the **Insured,** and the **Insurer** shall only be liable for the amount of **Defense Expenses** in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim,** and the Retention stated here shall not apply.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** NPP688510     **Effective:** 8/9/2020

RSG 204153 0118

# FIDUCIARY LIABILITY COVERAGE SECTION (NON-PROFIT)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### Fiduciary Liability

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Fiduciary Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this Coverage Section shall be non-rescindable by the **Insurer**.

## SECTION II. – ADDITIONAL COVERAGES

The **Insurer** shall pay **Loss** arising from **Additional Claims** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy which result in **Loss** as described in the Additional Coverages as shown below.

Any Sublimits and Retentions set forth in the Fiduciary Liability Declarations Page for the Additional Coverage(s) shall apply separately and specifically to any **Loss** arising from the specified Additional Coverage(s). Such Retentions shall be borne by the **Insured Organization**, and the **Insurer** shall only be liable for the amount of **Loss** arising from the specified Additional Coverage(s) that is in excess of the specifically stated Retention amount applicable to such Additional Coverage, and subject to the applicable Sublimit.

### A.  HIPAA Violations

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act ("HIPAA").

### B.  Voluntary Compliance Fees/Sanctions

The definition of **Loss** is amended to include:

1.  Any sanctions imposed upon an **Insured** as a fiduciary; or

2.  Any compliance fees incurred by an **Insured**, under the Employee Plans Compliance Resolution System described in any applicable Internal Revenue Service Revenue Procedure ("EPCRS Sanctions/Fees").

### C.  PPACA Civil Money Penalties

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act, as amended ("PPACA"), and any rules or regulations promulgated thereunder.

### D.  Plan Value Fiduciary Liability

**Loss** is amended to include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits".

### E.  Settlor Breaches of Duty

**Loss** is amended to include amounts incurred arising from Settlor Breaches of Duty, meaning any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA**, COBRA, or HIPAA, in the discharge of any **Insured's** duties in a settlor capacity with respect to **Employee Benefits**.

**F.  Other Penalties**

**Loss** is amended to include **Defense Expenses** resulting from any **Claim** arising out of:

**1.**  the civil penalties under Section 502(c) of **ERISA**;

**2.**  the civil penalties under the Pension Protection Act of 2006; and

**3.**  the 15% or less tax penalty imposed upon an Insured under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments.

## SECTION III. – DEFINITIONS

**A.  Additional Claims** means written demands or written allegations demanding relief as described in Section II., Additional Coverages, of this **Coverage Section**.

**B.  Administration** means:

**1.**  handling records in connection with **Employee Benefits**;

**2.**  effecting enrollment, termination or cancellation of **Employees** under an **Employee Benefits** program;

**3.**  giving counsel to **Employees** with respect to **Employee Benefits**; or

**4.**  interpreting **Employee Benefits**.

**C.  Claim** means a **Fiduciary Claim**.

**D.  Employee** means any natural persons whose labor or service is engaged by and directed by the **Insured Organization**, including part-time, seasonal, leased and temporary employees as well as volunteers. **Employee** shall not include any independent contractor.

**E.  Employee Benefits** means any **Plan** or **Healthcare Exchange**, and any workers' compensation insurance, unemployment insurance, Social Security or disability benefits for **Employees** of the **Insured Organization**.

**F.  ERISA** means:

**1.**  the Employee Retirement Income Security Act of 1974, as amended and any rules or regulations promulgated thereunder (including, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Heath Insurance Portability and Accountability Act of 1996 ("HIPAA"));

**2.**  the English Pension Scheme Act of 1993, and the English Pensions Act of 1995, as such Acts are amended and any rules or regulations promulgated under such Acts, and

any similar statutory or common law anywhere in the world, and any rules or regulations promulgated thereunder, and

**3.**  the privacy provisions under HIPAA.

**G.  Fiduciary Claim** means a:

**1.**  written demand for money or other civil relief commenced by the receipt of such demand;

**2.**  civil proceeding, including any arbitration or other alternative dispute resolution proceeding commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

**3.**  criminal proceeding commenced by the return of an indictment;

**4.**  written notice of the commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation; or

**5.**  formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar documents;

against an **Insured** for a **Fiduciary Wrongful Act**.

**H.  Fiduciary Wrongful Act** means any actual or alleged:

**1.**  breach of the duties, responsibilities or obligations imposed upon fiduciaries of any **Plan** by **ERISA** or the common law or statutory law of any jurisdiction governing such **Plan**; or

**2.**  any negligent act, error or omission by an **Insured** in the **Administration** of **Employee Benefits** or any other matter claimed against an **Insured** solely by reason of their service as a fiduciary of any **Plan**.

3. Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries of any **Plan** by the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); or

4. Other violation of HIPAA claimed against an **Insured** due solely to such **Insured's** service as a fiduciary of any **Plan**; or

5. Negligent violation of HIPAA by an **Insured** in the **Administration** of any **Plan**.

**I.** **Healthcare Exchange** shall be any facility or vehicle set up to facilitate the purchase of health insurance in each state in accordance with the Patient Protection and Affordable Care Act.

**J.** **Insured** means the **Insured Persons**, the **Plan** and the **Sponsor Organization**.

**K.** **Insured Person** means any director, officer, trustee, partner or **Employee** of the **Plan** or of the **Sponsor Organization** while acting in his or her capacity as a fiduciary or settlor of the **Plan**.

**L.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Fines, penalties or taxes imposed by law, except that **Loss** may include claimant's attorney's fees awarded by a court pursuant to Section 502(g) of the Employee Retirement Income Security Act of 1974, as amended, against an Insured; civil penalties of up to five percent (5%) imposed pursuant to Section 502(i) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") for inadvertent violation of Section 406 of **ERISA**, and civil penalties of up to twenty percent (20%) of any settlement or judgment imposed pursuant to Section 502(l) of **ERISA** for breach of fiduciary duty;

2. Benefits due or to become due under the terms of any **Plan**, unless and then only to the extent that recovery for such benefits is based on a **Fiduciary Wrongful Act** and is payable as the personal obligation of an **Insured** who is a natural person; provided that **Loss** shall include **Defense Expenses** with respect to any **Claim** seeking benefits due or to become due under the terms of any **Plan**; and **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits";

3. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

4. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

6. The cost of creating or reinstating employment;

7. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

8. Civil or criminal fines or penalties not expressly provided for in this **Coverage Section**;

9. Taxes, whether owed to or by any **Insured**;

10. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**M.** **Pension Benefit Plan** means any employee pension benefit plan, as such term is defined in **ERISA**, which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

**N.** **Plan** means any:

1. **Pension Benefit Plan** and any trust established to hold the assets of any such **Pension Benefit Plan**;

2. **Welfare Benefit Plan** which was, is now, or becomes sponsored solely by any **Sponsor Organization**;

3. **Pension Benefit Plan**, or any trust established to hold the assets of any such **Pension Benefit Plan**, created during the **Policy Period** by any **Sponsor Organization** or by any interest owned or controlled by such **Sponsor Organization** for the **Employees** thereof, but only if the Insured provides the Insurer with written notice of the creation of such **Pension Benefit Plan** within ninety (90) days of the effective date of such **Pension Benefit Plan**; and

4. otherwise covered **Plan** of any **Subsidiary** as that term is defined in the Common Policy Terms and Conditions SECTION III. - DEFINITIONS, M., or as allowed in the Common Policy Terms and Conditions SECTION V. – CONDITIONS, G., but only if the:

   (a) **Insured** provides the **Insurer** such additional information with respect thereto as the **Insurer** may reasonably require;

   (b) **Insured** provides the **Insurer** written notice of such acquisition as soon as practicable after the effective date thereof; and

   (c) **Insurer** specifically agrees by written endorsement to provide coverage with respect to such **Plan** and the **Insured** has accepted any additional terms, conditions and limitations of coverage, and agrees to pay any additional premium that the **Insurer** in its sole discretion, shall deem appropriate.

   **Plan** shall not include any multiemployer plan.

O. **Sponsor Organization** means the **Insured Organization** while acting in its capacity as a sponsor of a **Plan** solely for the benefit of its **Employees**.

P. **Welfare Benefit Plan** means any employee welfare benefit plan, as such term is defined in **ERISA** which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

## SECTION IV. - EXCLUSIONS

Specifically with respect to **Fiduciary Claims** or **Additional Claims**, exclusions in this endorsement shall govern in the event of any specific conflict between them and other exclusions in the policy.

The **Insurer** shall not be liable to make any payment for **Loss**, and shall have no duty to defend or pay **Defense Expenses**, in connection with any **Fiduciary Claim** made against any **Insured**:

1. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Fiduciary Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which was brought prior to the date referenced in Item 4. of the Fiduciary Liability Declarations Page;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure by any **Insured** to comply with any law, rule or regulation concerning workers' compensation insurance, unemployment insurance, Social Security or disability benefits, whether or not such failure to comply is willful;

3. For the failure to collect contributions owed to any **Plan** from any employer unless such failure is due to the negligence of an **Insured,** or for the return to any employer of any contributions if such amounts are or could be chargeable to a **Plan**; provided, this EXCLUSION 3. shall not apply to the **Insurer's** obligations, subject to the applicable Limit of Liability, to defend such **Fiduciary Claim** and to pay **Defense Expenses** resulting therefrom;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to Loss arising from a Claim for employment related retaliation;

5. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

6.  Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

7.  Made by or on behalf of a fidelity insurer against a natural person whose conduct has resulted in a **Loss** which has been paid under a fidelity bond; or

8.  Based upon, arising out of, directly or indirectly resulting from any discrimination, retaliation or wrongful termination of employment; provided, this EXCLUSION 8. will not apply to **Fiduciary Claims** asserted under Section 510 of **ERISA**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

**SECTION V. - CONDITIONS**

**A.  Coverage for New Plans**

If during the **Policy Period** the **Insured**:

1.  forms or acquires an employee welfare benefit plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured**; this **Coverage Section** shall automatically apply; or

2.  forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are less than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date; this **Coverage Section** shall automatically apply; or

3.  forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured** or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are equal to or greater than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date, then coverage is provided under this **Coverage Section**, but only upon the condition that within ninety (90) days of it becoming an **Employee Benefits** plan, the **Insured** provides the **Insurer** with full particulars of the new **Employee Benefits** plan and agrees to any additional premium and/or amendment of the provisions of this **Coverage Section** required by the **Insurer** related to such new **Employee Benefits** plan.  Further, coverage as shall be afforded to the new **Employee Benefits** plan is conditioned upon the **Insured** paying when due any additional premium required by the **Insurer** relating to such new **Employee Benefits** plan.

In all events, coverage as afforded with respect to this Section V.A. shall not apply to a Multi Employer Plan, a Multiple Employer Plan, or a Defined Benefit Plan.

**B.  Recourse**

It is agreed that, in the event an **Insured** breaches a fiduciary obligation under **ERISA**, the **Insurer** has the right of recourse against any such **Insured** for any amount paid by the **Insurer** as a result of such breach of fiduciary duty, but the **Insurer** shall have no such right of recourse if the policy has been purchased by the fiduciary or by an employer or an employee organization.

**C.  Termination of Plan**

If the **Sponsor Organization** terminates a **Plan**, coverage shall be afforded under this coverage extension with respect to such terminated **Plan** and its **Insureds**.  Such continuation of coverage shall apply with respect to **Fiduciary Claims** for **Fiduciary Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to or after the date the **Plan** was terminated.

**In Witness Whereof,** the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                President

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY
RENEWAL APPLICATION**



**NOTICE:**   **THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD AND REPORTED TO THE INSURER DURING THE POLICY PERIOD, OR THE EXTENDED REPORTING PERIOD, IF APPLICABLE.  THE LIMIT OF LIABILITY AVAILABLE TO PAY LOSS SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES.**

## I.  GENERAL INFORMATION SECTION

1. (a) Name of Organization:

   Highland-Clarksburg Hospital, Inc.

   (b) Organization Address:

   3 Hospital Plaza
   Clarksburg, WV 26301

2. Indicate Coverage and Limit Requested:

   | | | |
   |---|---|---|
   | D&O Liability Insurance Coverage: | Yes ☒  No ☐ | Limit Requested: $ 2,000,000 |
   | Employment Practices Liability Coverage: | Yes ☒  No ☐ | Limit Requested: $ 2,000,000 |
   | Third Party Liability Coverage: | Yes ☒  No ☐ | |
   | Fiduciary Liability Insurance Coverage: | Yes ☒  No ☐ | Limit Requested: $ 1,000,000 |

3. Indicate the Type of Limit Requested:

   ☒  Shared Limit of Liability for multiple Coverage Sections

   ☐  Separate Limit of Liability for each Coverage Section

   ☐  Combination of Shared and Separate Limits (provide details):

4. Please provide the following financial information for the Applicant and its Subsidiaries:

   | | Current Year | Prior Year |
   |---|---|---|
   | Date of Financial Statement: | | |
   | Total Assets: | | |
   | Total Liabilities: | | |
   | Fund Balance: | | |
   | Total Revenues: | | |
   | Net Income or Net Loss: | | |

5. As part of this Application, please submit the following with respect to the Applicant:

   *Directors & Officers Liability Coverage:*

   ✓(a) COMPLETE COPY OF LATEST ANNUAL REPORT. IF AUDITED FINANCIALS, PLEASE INCLUDE AUDITORS NOTES AND A COPY OF LATEST INTERIM FINANCIAL STATEMENT

   (b) CURRENT LIST OF DIRECTORS AND OFFICERS

   (c) COMPLETE COPY OF BY LAWS AND ARTICLES OF INCORPORATION

   *Employment Practices Liability Coverage:*

   N/A (a) EEO-1 REPORT (IF REQUIRED BY FEDERAL LAW)

   ✓(b) EMPLOYEE HANDBOOK

   *Fiduciary Liability Coverage:*

   ✓(a) A COPY OF THE MOST RECENTLY FILED FORM 5500 OR MOST RECENT AUDITED PLAN FINANCIAL STATEMENTS

## II.   DIRECTORS & OFFICERS LIABILITY SECTION *(Please complete only if coverage requested)*

1. (a) Have there been any changes in the Organization operations within the last twelve (12) months or is the Organization currently contemplating any merger or acquisition?   Yes ☒   No ☐
   If "Yes", please provide details on a separate page. *Affiliation with WVU Medicine 4/6/2020*

   (b) Has the Organization acquired or created any Subsidiaries within the last twelve (12) months?   Yes ☐   No ☒
   If "Yes", please provide details on a separate page.

2. Does the organization have an incident response plan for data breaches that is tested at least annually?   Yes ☒   No ☐
   If "No", please provide details on a separate page.

3. If applicable, is the organization Payment Card Industry Data Security Standard (PCI/DSS) compliant?   Yes ☒   No ☐
   If "No", please provide details on a separate page.

4. Does the organization purchase First Party and Third Party Network Security and Privacy Insurance Coverage?   Yes ☒   No ☐

5. If applicable, is the organization Health Insurance Portability & Accountability Act (HIPAA) / Health Information Technology for Economic & Clinical Health (HITECH) compliant?   Yes ☒   No ☐
   If "No", please provide details on a separate page.

6. Does the organization receive more than 10% of their revenues from any governmental source?   Yes ☒   No ☐

7. Does the organization offer, sell, advertise, market or solicit any product or service, or debt collection, employing any automatic/robo dialing, mobile phone texting, faxing, or any other type of communications based mechanism or strategy governed under the rules and regulations of the Telephone Consumer Protection Act of 1991 (TCPA), The Fair Debt Collection Practices Act or any laws governing unsolicited advertising or contacts for collections or promotion of goods or services?   Yes ☐   No ☒

8. Does the organization have a contract or agreement with any third party vendor to perform the above services on their behalf?   Yes ☒   No ☐

## III. EMPLOYMENT PRACTICES LIABILITY SECTION *(Please complete only if coverage requested)*

1. Number of Employees:

| Full time: | Part time: | Independent Contractors: | Volunteers: | Total: |
|---|---|---|---|---|
| 277 | 26 | 1 | 1 | 305 |

2. List total number of Employees in the following states:

   CA _0_   FL _0_   NJ _0_   NY _0_   TX _0_

3. Does the Organization anticipate making any reductions in the work force within the next twelve (12) months?   Yes ☐   No ☒
   If "Yes", please provide details on a separate page.

4. How many Employees or Officers have been terminated within the last twelve (12) months?
   Number of Employees: _157_   Number of Officers: _0_

## IV. FIDUCIARY LIABILITY SECTION *(Please complete only if coverage requested)*

1. Has any plan (a) been amended within the last 12 months in a way that will result in the reduction of benefits or are any such amendments anticipated within the next 12 months; or (b) been merged with another plan, terminated or sold within the past 2 years or is any such merger, Termination, sale or freezing anticipated in the next 12 months?   Yes ☐   No ☒
   If "Yes", please provide details of implementation, disclosure and any relevant blackout periods.

2. Does any plan invest in a mutual fund, collective trust or similar investment pool that receives investment management services from the Organization for a fee?   Yes ☐   No ☒
   If "Yes":
   How often are these fees reviewed by the trustees for fairness? _____
   Are these fees disclosed to participants?   Yes ☐   No ☐

3. Are any Plans non-compliant with plan agreements or ERISA?   Yes ☐   No ☒
   If "Yes", please provide details on a separate page.

The undersigned authorized Officer of the Organization, on behalf of the Organization and its Subsidiaries, and on behalf of the Directors and Officers of the Organization and its Subsidiaries declares that to the best of his/her knowledge and belief, the information, particulars, documents, representations and statements contained in, attached or referred to in this application for insurance and/or as a result of the underwriting process are true and accurate and recognizes that the Insurer, in issuing this policy, will rely on such information, particulars, documents, representations and statements.

Although the signing of this application does not bind the undersigned to effect insurance, the undersigned agrees, on behalf of the Organization and its Subsidiaries, and on behalf of the Directors and Officers of the Organization and its Subsidiaries, that the information, particulars, documents, representations and statements contained in, attached or referred to in this application for insurance and/or as a result of the underwriting process shall be the basis of the contract should a policy be issued and that this application will be attached to and will become part of such policy.  The Insurer is hereby authorized to make any investigation and inquiry it deems necessary in connection with this application.

**NOTE:**   This application must be signed by the Chairman of the Board, President or Executive Director and dated within thirty (30) days of the effective date of coverage.
The undersigned authorized Officer agrees that if the information supplied on this application changes between the date of this application and the effective date of the insurance, he/she (undersigned) will immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

Signature _Victoria V Oner_    Title _Chief Executive Officer_

(Chairman of the Board, President or Executive Director)

Date _4/2/2020_    Organization _Highland-Clarksburg Hospital, Inc._

Submitted By _____  Date _____

(Producer)

## SIGNATURE REQUIRED

### NEW YORK FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

_____  _____
Applicant's Signature    Date

### No Signature Required

### ARKANSAS, LOUISIANA, RHODE ISLAND, TEXAS AND WEST VIRGINIA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### ALABAMA FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution fines or confinement in prison, or any combination thereof.

### ALASKA FRAUD STATEMENT

A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

### ARIZONA FRAUD STATEMENT

For your protection Arizona law requires the following statement to appear on this form.  Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

### CALIFORNIA FRAUD STATEMENT

For your protection, California law requires that you be made aware of the following: Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

### COLORADO FRAUD STATEMENT

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

### DELAWARE FRAUD STATEMENT

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### DISTRICT OF COLUMBIA FRAUD STATEMENT

**WARNING:** It is a crime to provide false, or misleading information to an insurer for the purpose of defrauding the insurer or any other person.  Penalties include imprisonment and/or fines.  In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

### FLORIDA FRAUD STATEMENT

Any person who knowingly and with intent to injure, defraud or deceive any insurer, files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

### HAWAII FRAUD STATEMENT

For your protection, Hawaii law requires you to be informed that any person who presents a fraudulent claim for payment of a loss or benefit is guilty of a crime punishable by fines or imprisonment, or both.

### IDAHO FRAUD STATEMENT

Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

### INDIANA FRAUD STATEMENT

Any person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

### KANSAS FRAUD STATEMENT

Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

### KENTUCKY FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

### MAINE FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

### MARYLAND FRAUD STATEMENT

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

### MINNESOTA FRAUD STATEMENT

Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

### NEW HAMPSHIRE FRAUD STATEMENT

Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

## NEW JERSEY FRAUD STATEMENT

Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

## NEW MEXICO FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

## OHIO FRAUD STATEMENT

Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

## OKLAHOMA FRAUD STATEMENT

**WARNING:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

## OREGON FRAUD STATEMENT

Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents materially false information in an application for insurance may be guilty of a crime and may be subject to fines and confinement in prison.

## PENNSYLVANIA FRAUD STATEMENT

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

## PUERTO RICO FRAUD STATEMENT

Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

## TENNESSEE, VIRGINIA AND WASHINGTON FRAUD STATEMENT

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

# Highland-Clarksburg Hospital, Inc.
## Board of Directors
## 2020

Jill C. Rice, Chairman
215 Don Knotts Blvd., Suite 310
Morgantown, WV 26501
(304) 225-1430
Email: jill.rice@dinsmore.com
Term Expires: 12/31/2020

Greg Gordon, Vice Chairman
300 Summers Street, Suite 650
Charleston, WV 25301
Phone: 304-340-6970 (O)
Email: GGordon@BBandT.com
Term Expires: 12/31/2021

Shawn A. Miller, Secretary
98 Hickory Heights Drive
Clarksburg, WV 26301
Phone: (304) 288-6538
Email: Shawn.A.Miller@dominionenergy.com
Term Expires: 12/31/2021

Dustin W. Freshour, Treasurer
74 Foxden Drive
Mount Clare, WV 26408
Phone: (304) 627-7955
Email: dfreshour@mvbbanking.com
Term Expires: 12/31/2021

Joe Elliott
609 Broadway Ave.
Bridgeport, WV 26330
Phone: (304) 842-5431
Cell: (304) 494-5885
Email: jmelliott1969@gmail.com
Term Expires: 09/30/2022

Lyndon Auvil
126 Pennsylvania Avenue
Nutter Fort, WV 26301
Bus: 304-626-3743
Cell-304-672-0282
Email: lyndon@llauvil.com
Term Expires: 12/31/2021

Jonathon W. Fischer
439 West Philadelphia Ave
Bridgeport, WV 26330
Phone:    (304) 842-8090
Email:  jfischer@greerlawoffices.com
Term Expires 9/30/2023

Victoria Jones
3 Hospital Plaza
Clarksburg, WV 26301
Phone: (304) 969-3103
Email:  vjones@highlandhospital.net

# EXHIBIT 7



**RSUI Group, Inc.**
945 East Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

Phone   404-231-2366
Fax      404-231-3755

December 7, 2020

**CERTIFIED MAIL/**
**RETURN RECEIPT REQUESTED**

Highland-Clarksburg Hospital, Inc.
Attn: Robert Broyles
#3 Hospital Plaza
Clarksburg, WV 26301
Email: **rboyles@highlandhospital.net**

| | | | |
|---|---|---|---|
| Re: | Insured | : | Highland-Clarksburg Hospital, Inc. |
| | Claimant | : | Karen Whiteman |
| | Policy | : | NPP682977 |
| | Policy Period | : | 8/9/19 – 8/9/20 |
| | Limit of Liability | : | $2,000,000 |
| | Retention/Attachment | : | $75,000 |
| | Issuing Company | : | RSUI Indemnity Company ("RSUI") |
| | RSUI File | : | 7030152774 |

Dear Mr. Boyles:

As you know, I will be handling the above referenced claim for RSUI Indemnity Company ("RIC"). Please be sure to reference the above referenced claim number (7030152774) whenever you are sending me correspondence with respect to this matter. Please accept this letter as denial of coverage of the matter submitted for the reasons set forth herein.

On November 23, 2020, RIC received a claim submission consisting of a Complaint styled *Karen M. Whiteman v. Highland-Clarksburg Hospital, Inc.* ("Complaint") alleging age discrimination, hostile work environment, retaliation, wrongful termination, and outrage.

After our request for additional information, RSUI received a copy of the Charge of Discrimination filed with the EEOC and the Pennsylvania Human Relations Commission ("PHRC") dated January 17, 2020 ("Charge") alleging retaliation. The Charge was emailed to Highland-Clarksburg Hospital, Inc. on January 21, 2020. Also, an EEOC Dismissal and Notice of Rights dated January 21, 2020 was received.

<u>Statement of Facts</u>

RSUI Indemnity Company
Landmark American Insurance Company

*A member of Alleghany Insurance Holdings LLC*

In both the Charge and the Complaint, the Claimant contends that she filed an internal complaint of hostile work environment on June 6, 2019 in which she alleged that she had been subjected to verbal abuse and micromanagement by her manager.  The Claimant also contends that, despite her complaint, the harassment continued and on October 23, 2019 she was placed on a Performance Improvement Plan ("PIP").  The Claimant alleges that she was discriminated against based on her age and retaliated against.

Policy

RIC issued Policy NHP682977 to Highland-Clarksburg Hospital, Inc. for Claims first made from August 9, 2019 through August 9, 2020 that are reported in accordance with Policy conditions governing notice of Claim.  Subject to Policy terms, conditions, and exclusions, the Policy affords a $2,000,000 aggregate limit of liability in connection with any Employment Practices Claims, subject to a $75,000 retention for Wrongful Act(s) in connection with any Employment Practices Claim.  RIC will not be responsible for any amount incurred within the retention nor any amount in excess of the $2,000,000 limit of liability.  Additionally, Defense Expenses incurred in defending Claims will apply towards the depletion of the retention.

We direct your attention to the Employment Practices Liability Coverage Section's Insuring Agreement, at Section 1 of the Policy.  The Policy's pertinent Insuring Agreement is Insuring Agreement A, which provides as follows:

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application,** and subject to the terms, conditions, definitions, exclusions and limitations hereinafter or in the Common Policy Terms and Conditions, the Insurer agrees:

## SECTION I. - INSURING AGREEMENTS

### A.  Employment Practices Liability

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. Conditions, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of the this policy.

As you can see from the above-quoted Insuring Agreement, the Policy is triggered, subject to all other Policy terms, conditions and exclusions, by Claims for Employment Practices Claims that are "first made" against an Insured and reported in accordance with conditions for notice of Claim.

Claim is defined in the Employment Practices Liability Coverage Section III. as:

**A.**     **Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

 *A member of Alleghany Insurance Holdings LLC*

1.  A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

    a.  Receipt or service of a complaint or similar pleading;

    b.  Return of an indictment or filing of information; or

    c.  Receipt of a notice of charges;

2.  A written request to an Insured to toll or waive a statute of limitations regarding a potential Claim, commenced by the receipt of such request by the Insured;

3.  An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

    Provided such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

The Charge and the Complaint both reflect a Claim as defined in section 1 provided above.

**D.**  **Employment Practices Wrongful Act** means any actual or alleged:

i.  Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

ii.  Employment related harassment (including but not limited to sexual harassment);

iii.  Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

iv.  Employment-related retaliation;

v.  Employment-related misrepresentation to an Employee or applicant for employment with the Insured Organization;

vi.  Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

vii.  Wrongful failure to employ or promote;

viii.  Wrongful deprivation of career opportunity, wrongful demotion or negligent Employee evaluation, including the giving of defamatory statements in connection with an Employee reference;

 A member of Alleghany Insurance Holdings LLC

ix.   Employment related wrongful discipline;

x.   Failure to grant tenure or practice privileges;

xi.   Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

xii.   Violations of the following federal laws (as amended) including all regulations promulgated thereunder;

    a.   Family and Medical Leave Act of 1993;
    b.   Americans with Disabilities Act of 1992 (ADA);
    c.   Civil Rights Act of 1991;
    d.   Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or
    e.   Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

13.   Violation of an Insured Person's civil rights relating to any of the above; or

14.   Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with respect to any of the foregoing items 1 through 13,

whether such Employment Practices Wrongful Act as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the Employment Practices Wrongful Act actually or allegedly pertains to acts committed by an Insured and are alleged against an Insured by an Insured Person or applicant for employment with the Insured Organization.

With respect to multiple, related Claims, the Policy provides at V. Conditions B. 4. as follows, in pertinent part:

All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this Policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

Because the facts and events alleged in the Complaint are related and arise out of the facts and situations in the Charge, the Complaint is deemed interrelated to the Charge and deemed first made

 A member of Alleghany Insurance Holdings LLC

when the Charge was first received, which was at least by January 21, 2020 when you received the January 21, 2020 email from the EEOC providing notice of the Charge.

In this regard, we refer you to Policy Conditions Section V.C.1.of the NHP682977 Policy, which provides, in pertinent part, as follows:

> If, during the **Policy Period** or any Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than <u>sixty (60)</u> days after either the **Policy Period** expires or any earlier cancellation date of this policy.

As noted, Highland-Clarksburg Hospital, Inc. was issued the NHP682977 Policy incepting on August 9, 2019 and expiring on to August 9, 2020. In order to trigger coverage under this policy, notice must given as soon as practicable, but in no event later than 60 days after the expiration of the policy. In this instance, RIC did not receive first notice of this matter until November 23, 2020. As such, the NHP682977 Policy is not triggered and thus, there is no coverage for this matter.

The current Policy, number NPP688510, affords coverage for Claims that are both first made and reported within the August 9, 2020 to August 9, 2021 Policy Period. As the Charge was received on January 21, 2020, this Claim is deemed to have been first made at least by January 21, 2020. January 21, 2020 is prior to the inception date of the NPP688510 Policy Period. As such, the NPP688510 Policy has not been triggered, and thus, there is no coverage available for this Claim under the NPP688510 Policy.

RIC reserves its right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise, based upon all of the provisions, terms, conditions, exclusions, endorsements and definitions found in the Policy and additional facts that may come to RIC's attention. Moreover, any investigation or further action taken by RIC, or anyone on RIC's behalf, or any action not taken, should not be considered a waiver of any of RIC's rights, privileges, or defenses under the Policy, at law or in equity.

RIC's position is necessarily based upon information that has been made available to us at this point. If you believe that any of the facts or provisions of the Policy which have been cited in this letter are incorrect, please advise us so that we can discuss those statements with you and either clarify or correct them. Further, RSUI is willing to reevaluate its coverage position and to consider any new information that you may wish to present, subject to its full and complete reservation of rights. Because we have denied coverage for this matter, we plan to close our file shortly. If you have any questions or comments concerning this matter, please do not hesitate to contact me at the number listed below.

Sincerely,

Kyle W Dunton

RSUI   *A member of Alleghany Insurance Holdings LLC*

Kyle W. Dunton, Esq.
Chief Claims Specialist
Email at: Kdunton@RSUI.com
Direct phone (404) 260-3811


cc:    Kimberly Kirkman
       McGriff
       Email: **kkirkman@mcgriff.com**

RSUI   A member of Alleghany Insurance Holdings LLC

# EXHIBIT 8

**Whitney Patterson**

| | |
|---|---|
| **From:** | Dodrill, Terri <TDodrill@mcgriff.com> |
| **Sent:** | Friday, January 08, 2021 11:04 AM |
| **To:** | Whitney Patterson |
| **Cc:** | Victoria Jones; Robert Boyles; Canterbury, Dawn |
| **Subject:** | RE: Whiteman RSUI notice |

Dear Whitney,

I have heard back from the carrier regarding the claim. They have revisited the denial of coverage and unfortunately, have not reversed the position.  Please see the explanation offered below:

FROM RSUI:

The Charge of Discrimination, which was received on January 21, 2020, is a Claim, as defined in the policy.

As noted in the  12/7/20 letter, in order to trigger coverage under the NHP682977 Policy (incepting on August 9, 2019 and expiring on to August 9, 2020), notice of any Claim received in the Policy period must be given in no event later than 60 days after the expiration of the policy.

In this instance, RIC did not receive first notice of this matter until November 23, 2020. As such, the NHP682977 Policy is not triggered and thus, there is no coverage for this matter.

Also, the current Policy, number NPP688510, affords coverage for Claims that are both first made and reported within the August 9, 2020 to August 9, 2021 Policy Period.  As the matter (the Charge and the Complaint, which is clearly interrelated to the Charge) was received on January 21, 2020, this Claim is deemed to have been first made at least by January 21, 2020.  January 21, 2020 is prior to the inception date of the NPP688510 Policy Period.  As such, the NPP688510 Policy has not been triggered, and thus, there is no coverage available for this Claim under the NPP688510 Policy.

As I mentioned in our recent call, the notice of claim, even if questionable inasmuch as rising to the level of a claim, is significant especially when coverage is written on a claims made basis policy. They set forth the claim being first made and reported within the policy period for coverage to be afforded. I'm seeing very strict interpretation of the policy language surrounding these type matters by carriers of late. Please let me know if you all wish to have another call to discuss their response.

In the interim, do you know if the case will be moving forward or if it will likely be dismissed?  Please let me know how I can best assist as you decide how to move forward.

Thank you,
Terri



**Terri Dodrill**
*Business Insurance Agent, Assistant Agency Manager*

P: 304 340-6949 | C: 304-654-6534 | E: **tdodrill@McGriff.com**
300 Summers Street, Suite 650, Charleston, WV 25301 | McGriff.com

1

**From:** Whitney Patterson [mailto:wpatterson@highlandhospital.net]
**Sent:** December 07, 2020 3:35 PM
**To:** Dodrill, Terri
**Cc:** Victoria Jones; Robert Boyles
**Subject:** Whiteman RSUI notice

**[* This email contains attachments or links from an unverified sender. DO NOT open attachments or click links without verifying the sender. *]**

Terri – please see attached.  RSUI is denying coverage due to an EEO charge that was not reported to them. However, this charge was dismissed.  What are our options to remedy this situation?  Can we schedule a call to discuss?

Thank you,

**Whitney Patterson, CPA, CHFP**
Chief Financial Officer
Highland-Clarksburg Hospital, Inc.
(304) 969-3143
wpatterson@highlandhospital.net

Attention: HIPAA PHI: Special Handling Required
This email communication that you have received may contain Protected Health Information (PHI) as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Federal law mandates that you not use or disclose the information contained herein in any way that will compromise the privacy, security, or confidentiality of the individual to whom the information pertains. If this email communication has been misdirected to you, notify the sender of this email at your earliest opportunity, delete the email and destroy any copies of the email that you may have produced.

*Please be advised insurance coverage cannot be altered, bound or cancelled by voicemail, email, fax, or online via our website and insurance coverage is not effective until confirmed in writing by a licensed agent. The information in this transmission may contain proprietary and non-public information of McGriff, Seibels & Williams, Inc., Truist, or their affiliates and may be subject to protection under the law. The message is intended for the sole use of the individual or entity to which it is addressed. If you are not the intended recipient, you are notified that any use, distribution or copying of the message is strictly prohibited. If you received this message in error, please delete the material from your system without reading the content and notify the sender immediately of the inadvertent transmission.*

*Any information, analyses, opinions and/or recommendations contained herein relating to the impact or the potential impact of coronavirus/COVID-19 on insurance coverage or any insurance policy is not a legal opinion, warranty or guarantee, and should not be relied upon as such. As insurance agents, we do not have the authority to render legal advice or to make coverage decisions, and you should submit all claims to your insurance carrier for evaluation as they will make the final determination. Given the on-going and constantly changing situation with respect to the coronavirus/COVID-19 pandemic, this communication does not necessarily reflect the latest information regarding recently-enacted, pending or proposed legislation or guidance that could override, alter or otherwise affect existing insurance coverage. At your discretion, please consult with an attorney at your own expense for specific advice in this regard.*

# EXHIBIT 9



Attorneys at Law
One Penn Plaza
Suite 4701
New York, New York 10119
(646) 833-0900
Fax (646) 833-0877
www.tresslerllp.com

Michael R. Delhagen
646-833-0880
mdelhagen@tresslerllp.com

February 2, 2021

**VIA E-MAIL**

Mychal S. Schulz, Esq.
Babst Calland
BB&T Square
Charleston, WV 25301
mschulz@babstcalland.com

| | | |
|---|---|---|
| Re: | Insured: | Highland-Clarksburg Hospital, Inc. |
| | Coverage: | Non-Profit Organization Management Liability Policy |
| | Insurer: | RSUI Indemnity Company |
| | Policy No.: | NPP682977 |
| | Policy Period: | August 9, 2019 to August 9, 2020 |
| | Matter: | Karen Whiteman |
| | RSUI File No: | 7030152774 |
| | Tressler File No.: | 6986-231 |

Dear Mr. Schulz:

This firm represents RSUI Indemnity Company ("RIC") in connection with the following matters:  (1) a January 17, 2020 Charge of Discrimination against Highland-Clarksburg Hospital, Inc. ("Highland") filed by Karen Whiteman with the Equal Employment Opportunity Commission (the "EEOC") and the Pennsylvania Human Relations Commission (the "PHRC") (the "Charge"); and (2) a lawsuit styled *Karen M. Whiteman v. Highland-Clarksburg Hospital, Inc.*, Civil Action No. 20-6-265-1, filed on November 9, 2020 in the Circuit Court of Harrison County, West Virginia (the "*Whiteman* Lawsuit").

Please accept this letter as a supplement to Kyle Dunton's letter dated December 7, 2020 and a response to your letter dated January 15, 2021 addressing coverage for this matter. We are sending this letter to you in your capacity as the authorized representative of Highland.  If you are not acting in that capacity, please advise accordingly.

As discussed herein, RIC reiterates that there is no coverage for this matter under Non-Profit Organization Management Liability Policy NPP682977 (the "Policy") because Highland failed to provide notice of the Charge no later than sixty (60) days after expiration of the **Policy Period**[1], which is a condition precedent to coverage under the Policy.

---

[1] Bolded terms are as defined in the Policy.

California | Illinois | New Jersey | New York | Pennsylvania

Mr. Mychal Schulz
February 2, 2021
Page 2

## Summary of the Matter

### The Charge

#### Summary

On January 17, 2020, Ms. Karen Whiteman filed a "Charge of Discrimination" with the PHRC against Highland alleging that she has been "subjected to harassment, such as but not limited to, verbal abuse, weekly meetings, job criticism, and micromanagement by Valerie Hudson." Ms. Whiteman further asserted in the Charge of Discrimination that she believed that she had been "retaliated and discriminated against based on [her] age, 53, in violation of the Age Discrimination in Employment Act of 1967, as amended (ADEA) when [she] was placed on a Performance Improvement Plan after [she] filed a hostile work environment complaint."

#### Status

On January 21, 2020, the EEOC sent Ms. Whiteman a "Dismissal and Notice of Rights," dismissing her Charge of Discrimination and making the following determination:

> Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that may be construed as having been raised by this charge.

The Dismissal and Notice of Rights further provided Ms. Whiteman with "Notice of Suit Rights," which indicates that Ms. Whiteman has the right to sue Highland in state and federal court pursuant to various statutory time limitations. RIC understands that Highland received a copy of the Charge of Discrimination and the Dismissal and Notice of Rights on January 21, 2020.

### The *Whiteman* Lawsuit

#### Summary

On November 13, 2020, Ms. Whiteman served the *Whiteman* Lawsuit in the Circuit Court of Harrison County, West Virginia. The plaintiff alleges that she began working for Highland in October 2016. According to the complaint, in early 2019 the plaintiff was assigned to report to Ms. Valerie Hutson. The plaintiff alleges that "for several months thereafter, [she] was subject to being treated in a disparate manner due to her age, including being verbally abused by said Valerie Hutson as well as had to ensure hearing the co-workers on her team being verbally abused repeatedly by the said Valerie Hutson."

According to the complaint, on June 6, 2019, the plaintiff filed an official complaint of discrimination and hostile work environment with the confidential compliance line offered through Highland. The plaintiff asserts that on October 31, 2019, she was given a Performance Improvement Period by Highland. According to the complaint, on November 1, 2019, the plaintiff filed a complaint with the EEOC.[2] The plaintiff alleges that although she "performed all of her job

---

[2] Highland has indicated that it never received notice of a November 1, 2019 complaint with the EEOC and is only aware of the Charge, dated January 17, 2020.

Mr. Mychal Schulz
February 2, 2021
Page 3

duties in a satisfactory and/or above satisfactory manner," on June 12, 2020, the plaintiff was constructively discharged from her position at Highland.

The plaintiff brings the following causes of action against Highland: (1) age discrimination; (2) hostile work environment; (3) retaliation in violation of the West Virginia Human Rights Act; (4) retaliation for reporting age discrimination and hospital work environment with the EEOC; (5) wrongful termination -- age discrimination West Virginia Human Rights Act; and (6) tort of outrage.  The plaintiff seeks damages in an unspecified amount, including punitive damages, attorney fees, costs, interest, and other relief as the Court or jury seem just.

## The Policy

RIC issued Non-Profit Organization Management Liability Policy NPP682977 (the "Policy") to Highland for the period August 9, 2019 to August 9, 2020 (the "**Policy Period**"). The Policy is effective for **Claims** first made and reported during the **Policy Period**.  The Policy is subject to common policy terms and conditions and specific terms and conditions relevant to the Coverage Parts purchased by the **Insured**.  With respect to Employment Practices Liability Insurance (Coverage Part B.), the Policy provides a $2 million Aggregate Limit of Liability, subject to a $75,000 retention.

## Coverage Evaluation

### Denial of Coverage

As set forth in Mr. Dunton's letter dated December 7, 2020, RIC concluded that the Charge is a **Claim** as that term is defined in the Employment Practices Liability Coverage Section III. Moreover, because the facts and events alleged in the *Whiteman* Lawsuit are related and arise out of the facts and situations in the Charge, RIC concluded that the *Whiteman* Lawsuit is deemed interrelated to the Charge and deemed to be a single **Claim** first made when the Charge was first received, which was at least by January 21, 2020 when Highland received notice of Charge and Dismissal and Notice of Rights.

Pursuant to Section V.C.1 of the Common Terms and Conditions Coverage Section ("Reporting and Notice Provision"), the Policy provides that:

> If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the Insurer's obligation to pay, that the **Insured** give written notice of such **Claim** to the Insurer as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

Pursuant to the above, the **Insureds** were required to give RIC written notice of the **Claim** no later than 60 days after expiration of the **Policy Period**.  However, the **Insureds** did not provide notice of the **Claim** until November 23, 2020, more than 10 months after first learning that the **Claim** was made and more than three months after the expiration of the **Policy Period**. Accordingly, RIC has concluded that the **Insureds** failed to provide notice within sixty days after the **Policy Period** expired, which is a condition precedent to coverage. *See Smith v. Lindsay*, 2011 WL 9820531 (Cir. Ct. W.Va. Oct. 26, 2011) (*affirmed on appeal*) (finding insurer not required to

Mr. Mychal Schulz
February 2, 2021
Page 4

establish prejudice under claims made and reported policy where insured failed to provide notice during the policy period). RIC declines coverage under the Policy on this basis.

In your letter dated January 15, 2021, you assert that West Virginia requires a "two-step inquiry" to determine whether late notice precludes coverage: first, whether the length of the delay was reasonable; and second, if the delay was reasonable, whether the insurer was prejudiced by the late notice. However, the cases cited in your letter appear to involve "occurrence" policies and not claims made and reported policies like the Policy at issue here. *See Smith v. Lindsay*, 2011 WL 9820531 (Cir. Ct. W.Va. Oct. 26, 2011) (*affirmed on appeal*). Specifically, in *Smith*, which involved a claims made and reported policy, the court explained:

> [T]he adoption of a prejudice requirement would be contrary to the plain language of the [policy], which unambiguously requires that a claim be both "first made" and "first reported" within the same policy period in order to qualify for coverage. Moreover, I conclude that the adoption of a rule requiring prejudice would undermine claims-made coverage and would therefore conflict with the decisions of the Supreme Court of Appeals enforcing such coverage.

*Id.* (citing *Soliva v. Shand, Morahan & Co., Inc.,* 176 W.Va. 430, 433 (1986); *Auber v. Jellen,* 196 W.Va. 168, 174 (1996)). Given that Highland failed to provide notice of the Charge within 60 days after the **Policy Period** expired, there is no coverage for Highland for this matter and RIC again declines coverage under the Policy on this basis.[3]

\*     \*     \*

In the event you disagree with any of the analysis set forth above, please provide the basis for that disagreement. RIC continues to reserve all rights, remedies and defenses under the Policy and applicable law. Nothing state herein, or not stated, shall be deemed to be a waiver or compromise of any rights, remedies or defenses which RIC has or may obtain.

Please do not hesitate to contact me if you would like to discuss any of the above.

Very truly yours,

Michael R. Delhagen

cc:     Kyle W. Dunton, Esq.

---

[3] Even assuming that some "reasonableness" standard is available to Highland (which it is not), Highland's failure to provide notice of the Charge was unreasonable under the circumstances. RIC's review of the EEOC Dismissal and Notice of Rights indicates that the EEOC's dismissal was not a decision on the merits, but merely an indication that in the EEOC's limited investigation did not uncover any unlawful discrimination. Therefore, Highland should have been aware that a future lawsuit may result from Ms. Whiteman's allegations.